Submitted March 25, affirmed November 17, 2010

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROSENDO LUNACOLORADO,
aka Rosendo Luna-Colorado,
*Defendant-Appellant.*

Multnomah County Circuit Court
080647967; A139805

243 P3d 125

Peter Gartlan, Chief Defender, and Daniel C. Bennett, Deputy Public Defender, Appellate Division, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Matthew Lysne, Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Judge.

SCHUMAN, P. J.

Wollheim, J., concurring.

## SCHUMAN, P. J.

■        Defendant appeals a judgment for criminal contempt based on his violation of a restraining order. ORS 33.065. He assigns error to the trial court's denial of his motion to suppress incriminating statements he made during a police interrogation. Defendant argues that, because of his lack of proficiency in English, he did not understand the *Miranda* warnings that were administered to him; as a result, he contends, his statements were presumptively involuntary and had to be suppressed under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution, both of which provide guarantees against compelled self-incrimination. We review the trial court's decision for errors of law, but we are bound by the findings of fact on which that decision is based if they are supported by any evidence. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). For the reasons set forth below, we affirm.

        The following facts are undisputed. Defendant was prohibited by a restraining order from contacting his ex-partner Cruz.[1] While the order was in effect, however, Cruz received a letter, written in Spanish, from defendant's mother. Cruz suspected that defendant wrote the letter and had his mother deliver it to Cruz. Cruz gave the letter to the Gresham police. Defendant was arrested and transported to the police station where Detective Silva and Officer Clay questioned him about the letter's authorship. Before doing so, Silva gave defendant *Miranda* warnings in English and asked defendant if he understood them. Defendant responded that he did not. The detective then repeated the warnings "point by point and explained them to [defendant], and then [asked defendant] if he understood. * * * And he said he did." At some point in the interaction, defendant requested an interpreter, but the detective told him none was available. Silva, however, believed that he and defendant were "communicat[ing] effectively" and that the conversation could continue in English. He asked if defendant was willing to speak with him and Officer Clay. Defendant replied that

---

[1] It is not clear from the record whether defendant and Cruz were ever married. Detective Silva refers to Cruz as defendant's "wife," while Cruz testified that defendant was her "partner."

"he wanted to know what it was about first." Silva told him about the letter Cruz had given to the police, and defendant agreed to talk about it. Although he acknowledged that Cruz had a restraining order against him and that he had a copy of the order, he denied having written the letter. He repeated the denial several times during the subsequent interrogation. At one point, according to Silva, defendant

> "said something about, well, you know, why would he want to talk to us. And I said—and I just asked him, I said, who wrote the letter. And again, Officer Clay followed up by telling [defendant] we were trying to figure out who wrote it if it wasn't him, and then his response was 'because it's real.' And I didn't really understand what [defendant] meant, so I asked him again who wrote it, and [defendant] said me. And when I asked why, he says 'because I love my kids.' "

The foregoing facts were adduced at the hearing on defendant's motion to suppress. Cruz also testified at the hearing, through an interpreter. She related that she and defendant had lived together for six years and that, whenever an English-speaking person telephoned, she handed the receiver to defendant, who would then speak to the caller in English.

The court denied defendant's motion to suppress. In its ruling, the court stated,

> "I'm troubled by the—by the request for the interpreter which wasn't fulfilled, but on the evidence that's before me, it appears to me that the officer, the detective, believed that he was having a conversation that was being interpreted—being understood on both sides, and so I will deny the motion to suppress at this time."

At the subsequent trial, defendant was convicted of criminal contempt for violating the restraining order.

On appeal, defendant advances a two-step argument. First, he contends that, as demonstrated by the ruling quoted above, the trial court misapprehended the law; the court ruled against defendant based on its finding that the officer believed that defendant understood the *Miranda* warnings, when, in fact, the correct inquiry is whether defendant understood them—an inquiry regarding which the officer's belief is not dispositive. Second, he contends that the

correct answer to the correct inquiry is that defendant did not understand the warnings. The state responds that the trial court indirectly addressed the issue of defendant's understanding, that the court implicitly found that defendant understood the warnings, and that we must defer to that implicit finding. We agree with the state.

The law in this area is well-settled. In order to ensure that a suspect who is subjected to custodial interrogation is not compelled to provide information that can subsequently be used against him in a criminal prosecution, and to ensure that the suspect is afforded the right to counsel, the Oregon and United States constitutions require that police administer the familiar warnings set out in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). US Const, Amend V; Or Const, Art I, § 12; *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990). Evidence resulting from interrogation that occurred without *Miranda* warnings is generally inadmissible unless the state can prove that the suspect knowingly waived his or her right to remain silent and right to an attorney. *State v. James*, 339 Or 476, 491, 123 P3d 251 (2005). A suspect who does not understand that he or she has those rights—that is, who does not understand the *Miranda* warnings—has not validly waived them. *State v. Ruiz*, 251 Or 193, 444 P2d 32 (1968).

The parties agree that defendant was in custody when questioned by the officers, that the questioning was "interrogation," and that the *Miranda* warnings that Silva recited were correct and sufficient. The question before the trial court and on appeal is whether, given defendant's command of English, he understood the warnings. Defendant asserts that the trial court did not know that it had to find that defendant understood his rights; rather, according to defendant, the court believed that it could deny the motion upon a finding that the officer believed defendant understood them. Defendant's argument hinges on the trial court's ruling, specifically its finding that "the detective believed that he was having a conversation that was being interpreted—being understood on both sides." The state counters that, under *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968), this court must infer that the trial court made a finding as to

defendant's understanding because there was conflicting evidence on that fact and the trial court ultimately denied the motion.

The state's argument loads *Ball* with more freight than it can carry. In that case, the Supreme Court explained that, if a trial court does not make express findings of historical fact on a question, and the record contains conflicting evidence with respect to that fact, the reviewing court may infer that the trial court resolved the disputed issue in a manner that is consistent with its legal conclusion.

> "What actually transpired is a question of fact for the trial court or jury. If the evidence sustains such historical factual findings they will not be disturbed by this court. If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion."

*Id.* at 487. In one situation, then, *Ball* allows us to infer a finding of fact that the trial court does not expressly make: when there is conflicting evidence about a fact that is a necessary predicate to the court's conclusion.

However, if defendant is correct that the court misapprehended the law, then *Ball* cannot supply the implicit finding. That is so, because the implicit finding—that defendant understood the *Miranda* warnings—is *not* a necessary predicate to the conclusion that the court reached if, as defendant argues, the court reached its conclusion on the ground that the *officer believed* that defendant understood the warnings. Put another way: If defendant is correct that the court based its legal conclusion on the officer's belief, the court could have reached that conclusion without necessarily deciding anything about whether defendant *in fact* understood the warnings—because, under the court's reasoning (as described by defendant), defendant's actual understanding was not an issue. The state, then, applies *Ball* prematurely. The reasoning in that case allows us to infer a finding of fact, but only where we can deduce that the trial court's chain of reasoning must necessarily have included that fact as one of its links. Here, that would require a demonstration that the court correctly understood that it needed to determine

whether defendant actually understood the warnings. The state's argument does not undertake that preliminary step.

We do. The record shows that the court did not misapprehend the law. The question of defendant's understanding was properly framed for the court and the court heard conflicting evidence on the issue of defendant's understanding. From the outset, defendant's attorney asserted that the premise of the hearing was to determine defendant's understanding of the *Miranda* warnings. The subsequent testimony of the state's witnesses addressed that argument. Silva testified that defendant understood the warnings only after the detective recited them "point by point," but that defendant did clearly indicate his understanding. Cruz also testified as to defendant's English competency, asserting that defendant spoke and understood English. After the witnesses' testimony, the parties' closing arguments focused on whether the evidence proved that defendant understood the *Miranda* warnings. Finally, the court's ruling considered the evidence before it and implicitly found that Silva and defendant had a conversation "understood on both sides." Thus, we are convinced that the trial court applied the correct legal test and denied the motion based on evidence of defendant's understanding and not based on evidence of the officer's belief.

◼ Having decided that the court based its ultimate conclusion on the (implicitly found) fact that defendant understood the *Miranda* warnings, we can *now* apply *Ball* to determine whether there was adequate evidence in the record to support that (implicitly found) fact. As noted above, we must accept the fact if there is any evidence to support it. Or Const, Art VII (Amended), § 3; *Ehly*, 317 Or at 75. There is more than adequate support. After the detective repeated the warnings "point by point" defendant told the detective that he understood his *Miranda* rights. When asked whether he would speak to the detective, defendant responded that he first wanted to know why. After the detective explained the focus of his inquiry, defendant stated he was willing to speak with the detective. Consistent with the trial court's finding, this dialogue demonstrates that the defendant recognized that speaking to the detective was an option, not a requirement. Further, defendant conversed with the detective in

English, and the detective testified that he and defendant "communicated very effectively."

In sum, the trial court grounded its denial of defendant's motion to suppress on an implicit finding that defendant understood the *Miranda* warnings and therefore knowingly waived the rights associated with his interrogation. Moreover, the record contains constitutionally sufficient evidence to support that finding. The trial court did not err in denying defendant's motion to suppress.

Affirmed.

**WOLLHEIM, J.,** concurring.

I concur with the majority's holding that the record contains constitutionally sufficient evidence to support the trial court's implicit finding of fact that defendant understood the *Miranda* warnings. But, like the trial court, I am troubled by the fact that defendant asked for an interpreter and did not receive one. I write separately to emphasize the difference between the ability to understand and participate in a conversation in English and being able to fully understand legal proceedings.

As the majority states, a suspect who does not understand the *Miranda* warnings has not validly waived them. *State v. Ruiz*, 251 Or 193, 195, 444 P2d 32 (1968). The Oregon legislature has also addressed the issue of suspects who cannot readily understand or communicate in English. ORS 133.515 provides, in part, that, if a suspect cannot readily understand or communicate in the English language, then the officer shall make a qualified interpreter available to the suspect before interrogating him or taking his statement.[1]

---

[1] ORS 133.515 provides, in pertinent part:

"(1) As used in this section:

"(a) 'Person with a disability' means a person who cannot readily understand or communicate the English language, or cannot understand the proceedings or a charge made against the person, or is incapable of presenting or assisting in the presentation of a defense, because of deafness, or because of a physical hearing impairment or physical speaking impairment.

"(b) 'Qualified interpreter' means a person who is readily able to communicate with the person with a disability, translate the proceedings, and accurately repeat and translate the statements of the person with a disability to the officer or other person.

Here, when defendant said that he could not understand the *Miranda* warnings, the officer, instead of stopping the questioning until a qualified interpreter was available, repeated the *Miranda* warnings, explained them, and asked defendant if he understood. The officer testified that defendant said he understood the *Miranda* warnings. Nonetheless, defendant later asked for an interpreter. The officer told defendant that no interpreter was available and continued questioning defendant.

There is a vast difference, however, between being able to carry on a conversation in English and being able to understand and waive constitutional rights. In *Immigrants in Courts*, Joanne I. Moore and Ron A. Mamiya explain:

"As a result of language acquisition barriers, many immigrants, especially those who moved to the United States as adults, have mastered their second languages at a conversational level rather than at a 'fully bilingual' level. For example, many immigrants are able to master conversational English, with or without grammar problems or heavy accents, so as to be able to talk with employers about job duties, go to the store, or converse with co-workers. Their conversational ability in their *native* tongues is often much greater and may range up to more complex linguistic levels."

Joanne I. Moore and Ron A. Mamiya, *Interpreters in Court Proceedings, in Immigrants in Courts*, 32 (Joanne I. Moore ed., 1999) (emphasis in original). The language used in courts and legal proceedings is much more complex than conversational English. The Oregon Supreme Court Task Force on Racial Ethnic Issues noted:

"The American justice system is a complex amalgam of difficult jargon, concepts and procedures. What judges and lawyers take for granted often seems unintelligible, even nonsensical, to intelligent persons who use the courts. The

---

"(2) Upon the arrest of a person with a disability and before interrogating or taking the statement of the person with a disability, the arresting peace officer, or when the arrest is by a private person, the officer to whom the person with a disability is delivered, shall make available to the person with a disability, at the earliest possible time, a qualified interpreter to assist the person with a disability throughout the interrogation or taking of a statement."

problem is exacerbated for the non-English-speaking litigant. Many non-English-speaking litigants have no understanding of how American justice works. Legal concepts such as arraignment, reasonable doubt, jury trial, relevance, hearsay or motion to suppress are not always understood."

Report of the Oregon Supreme Court Task Force on Racial/Ethnic Issues in the Judicial System, 11 (May 1994), http://courts.oregon.gov/OJD/docs/OSCA/cpsd/courtimprovement/access/RETF/ch2.pdf (accessed Nov 9, 2010). Additionally, in *Immigrants in Courts*, Moore and Mamiya state that, "[f]or an immigrant party to be considered bilingual in a legal proceeding, the party's language level should be at least at the 12th-grade level in both languages. * * * If limited-English-speaking parties do not understand English to this degree, they will miss a large percentage of what is being said unless interpreters are appointed." Moore and Mamiya, *Immigrants in Courts* at 32. Moore and Mamiya cite studies finding that "the difficulty of court language [is] at the 14th grade level for Spanish" and "court language is at the 12th-grade level plus technical legal language." *Id.* at 240 n 12.

The requirements for being a court interpreter further demonstrate the difference between being able to carry on a conversation in English and fully comprehending legal matters in two languages. The Oregon Judicial Department's website, which provides information for potential interpreters, states, in part, "A common misperception is that simply being bilingual is enough to interpret in the courts. The task of interpreting requires 32 different knowledge, skills and abilities * * *." Overview to Working in Oregon's Courts, http://courts.oregon.gov/OJD/OSCA/ cpsd/InterpreterServices/OverviewtoWorkinginOregonsCourts.page (accessed Nov 9, 2010). In addition, court interpreters must have knowledge and vocabulary of court proceedings and court procedures. *Id.*

Even if defendant was able to carry on a conversation in English, there is no evidence in this record that defendant's understanding of English is at the twelfth-grade level that Moore and Mamiya suggest is necessary for defendant to understand the officers' questioning and for defendant's subsequent waiver of his constitutional rights. However, there is

no requirement under Oregon law that a defendant understand English at the twelfth-grade level.

There is no dispute: This court is bound by the trial court's findings if there is any evidence to support them, as there is here. But if I were to weigh the evidence again, I might reach a different outcome. Therefore, I concur with the majority's holding that, on this record, the trial court did not err in denying the motion to suppress.