Argued and submitted September 7, reversed and remanded December 1, 2021

In the Matter of O. A. M. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. L. M.,
aka T. P.,
*Appellant.*

Multnomah County Circuit Court
19JU08825;
Petition Number 113906;
A175708

502 P3d 1176

Beth A. Allen, Judge.

Kristen G. Williams argued the cause and filed the briefs for appellant.

Jon Zunkel-deCoursey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

TOOKEY, J.

Reversed and remanded.

**TOOKEY, J.**

In this juvenile dependency case, mother appeals a juvenile court judgment requiring that she undertake a psychological evaluation. On appeal, mother argues, among other points, that the juvenile court erred by ordering her to undertake the psychological evaluation, because the record is insufficient to show that a "psychological evaluation is 'rationally related' to the established jurisdictional bases." For the reasons that follow, we agree with mother, and we reverse and remand.[1]

## I.  FACTS

"We review the juvenile court's factual findings for any evidence and its legal conclusions for errors of law." *Dept. of Human Services v. W. C. T.*, 314 Or App 743, 745, 501 P3d 44 (2021).

In November 2019, mother and father brought O, an infant, to the hospital. O tested positive for methamphetamine, and neither mother nor father could provide an explanation about how O had ingested the methamphetamine.

In January 2020, the juvenile court found that it had jurisdiction over O based on parents' admissions. Mother admitted to two jurisdictional bases: (1) that "mother's substance abuse interferes with her ability to safely parent [O]," and (2) that "[w]hile in the care of the parents the child tested positive for methamphetamine and the mother was not able to protect the child from the unsafe environment."

Over the following months, mother's attempt to ameliorate her substance abuse problem progressed in fits and starts: In January 2020, mother was engaged in outpatient treatment but was discharged from that treatment in March 2020 due to "lack of engagement." Mother was then referred to another treatment provider, but, in May 2020,

---

[1] At the outset we note that, during the pendency of this appeal, mother undertook the ordered psychological evaluation, and the trial court subsequently dismissed the dependency petition. Based on the dismissal of the petition, DHS filed a notice of probable mootness. Mother objects to dismissal based on mootness. In the circumstances of this case, because mother has undertaken the psychological evaluation as ordered by the court, we are not persuaded that mother's challenge to the ordered psychological evaluation is moot, given potential collateral consequences.

mother's treatment was "closed" for "lack of engagement." In July 2020, mother completed an assessment with a third provider, engaged in treatment, and provided urinalysis (UA) tests that were negative for controlled substances. By September 2020, however, mother was only "minimally engaged" in treatment and provided a UA test that was positive for methamphetamine and THC. And, in October 2020, the juvenile court expressed concern that mother was not "solidly" in treatment.

In November 2020, mother and father were not living together, O was returned to father's care, and mother had reengaged with drug treatment. Mother began unsupervised visits with O in December 2020.

Shortly thereafter, however, when father tried to pick up O from mother to take O to an appointment, mother "would not give" O to father. Both parents called a DHS caseworker and father left the DHS caseworker voicemails. The caseworker heard mother "yelling in the background" of father's voicemails. DHS "prompted" mother and father "numerous" times to reach a custodial agreement regarding O, but the parents "did not follow through" on that prompting.

On January 8, 2021, a DHS worker received an update from mother's drug treatment service provider, stating that mother was "close to the end" of treatment. The treatment provider stated that clients need to provide "12-13 consecutive UAs" to complete treatment and that mother had provided 12; that mother had been consistently attending group meetings; and that mother could potentially complete treatment in 3-4 weeks.

On February 1, 2021, at a review hearing, DHS "hesitantly" recommended that the juvenile court dismiss jurisdiction over O because there was "no active safety threat" to O. DHS believed, however, that the "child would benefit if the parents had a custodial agreement" to ensure O would be "returned to his father in a safe and conflict-free manner." At the February 1, 2020, hearing, the juvenile court agreed to dismiss the case "with hesitation," expressing concern that the parents would not be able to "work out parenting time without an order in place." The juvenile court also

expressed concern that "when things don't work out, things get hostile quickly," and that O could become "the rope in [a] tug-of-war" between mother and father.

Following the February 1, 2021, hearing—but before a judgment dismissing the case was entered—father filed an "immediate danger motion" regarding O, which prompted a juvenile court hearing on February 5, 2021. In a declaration attached to father's immediate danger motion, father averred that on January 30, 2021, at 2:00 a.m., mother came to father's home; mother began "banging on the doors and on the windows"; mother threatened to "wreck our cars if I did not let her in"; mother shouted at father; and mother attempted to remove O from father's home.

In that same declaration, father also averred that he had let mother spend the night on the couch in his home; that the following morning mother "resumed her tirade" and called father "unfit"; that mother "started throwing things at [father] and hit [father] in the back of the head with the remote control for the TV"; and that mother then took O and left. According to father, mother also "made it clear that she has no intention of ever returning [O] to [father]." Father described mother as "behaving like she is under the influence of some sort of drug."

In response to father's motion, a DHS caseworker spoke with mother. Mother explained to the caseworker that she had called father on January 30 around 3:00 p.m. to arrange to visit O and that father confirmed his understanding regarding that planned visit; that father had not subsequently answered calls from mother and she went to his home around 8:00 p.m. or 9:00 p.m.; that father's roommate let mother inside; that mother played with O, had a conversation with father, and then left; that, after mother left, mother and father exchanged text messages; that mother returned to father's home around 1:30 a.m.; that father let mother in and the two spoke then "had relations"; that the next morning mother told father "we're going to go," and then "got the baby ready"; and when mother got to her home, mother's sister informed mother that father "said he was going to call the police," and mother told mother's sister that father was scheduled to have O the following day.

At the February 5, 2021, hearing, the DHS case-worker testified that it was unclear whether mother's or father's version of the events of January 30, 2021, was accurate, but that, "regardless of whose version of events you believe regarding the night of January 30th, either version of events puts [O] in a harmful situation." In addition, at the February 5, 2021, hearing, evidence was presented by DHS that mother had missed a UA on January 28, 2021, because the temperature of the urine sample she provide was too hot to be accepted by her treatment provider.

Additionally, at the February 5, 2021, hearing, DHS requested that the court order mother and father to participate in psychological evaluations. That request led to the following exchange between counsel for DHS and the DHS caseworker:

"Q:  Do you believe that a psychological evaluation would be appropriate for both the mother and the father in this case in order for them to resume wardship of their children?

"A:  Yes.

"Q:  First, could you start by testifying as to why you believe it would be appropriate for the mother to engage in a psychological evaluation that complied with those recommendations?

"A:  The agency believes that it would be appropriate for the mother to undergo a psychological evaluation to get a fuller understanding of her behaviors, not only surrounding [the night of January 30, 2021,] but as a protective parent and if she was able to provide unsupervised care for her child.

"And if the substance use is an ongoing issue, if she needs treatment recommended or follow-up with counseling or whatever that psychologist would recommend at that evaluation.

"Q:  Do you believe it would also benefit not only in terms of assessing the reasons why it appears she cannot maintain her sobriety but also in terms of assessing the relationship between the father and the mother?

"A:  Yes.

"Q:   And specifically in regard to the father, do you believe a psychological evaluation would be appropriate and necessary for him to safely have the child in his care going forward?

"A:   Yes.

"Q:   Can you please testify to the Court why you believe that that is completely necessary?

"A:   As I've worked with the family and specifically [father] and [mother], it has been difficult to get an understanding of their relationship and their parenting practices.

"Mostly based off of when we had placed the child with [father], it was unclear at times because sometimes it was reported to me that everything was fine between the two and they could work on parenting time between the two of them.

"And then other times he would call and—sounding distressed, saying that things such as [mother] was not giving the child back to him and he was worried. And so it would be helpful to have a fuller understanding of that relationship.

"Q:   And do you also believe that the psychological evaluation would assist in identifying the issues which DHS has ultimately had a great deal of difficulty in being able to identify, specifically in regards to parents being less than truthful about issues?

"A:   Yes.

"Q:   And would a good example of that being the fact that there's a significant incident that occurred on or about January 30th and a full two days later neither parent had reported that information or been transparent with the agency about that?

"A:   Yes."

At the end of the hearing, the juvenile court ordered a psychological evaluation. The court stated that "it's unclear how this all came to be, despite frankly my concerns, * * * that it didn't seem to me that these two parents were getting along very well and I sure wish that we had a judgment in place that would have clarified who had the child when." The court noted that it was "inclined" to order the

parents to undertake psychological evaluations because "it just doesn't make a lot of sense and it does seem to me that a psychological evaluation for both parents might help us get at exactly what is going on here." Following the February 5, 2021, hearing, O was placed with a foster provider.

A few days later, on February 8, 2021, father told the DHS caseworker that he had "lied about the entire situation" that took place on January 30, 2021, and said that mother's "story was right." He explained that he had panicked, and that O was never unsafe.

On February 24, 2021, the juvenile court held a review hearing, in part to hear additional arguments about the psychological evaluations. At that hearing, a DHS worker testified that since the hearing on February 5, 2021, mother had missed a urinalysis test; that O had been returned to father's care on February 18, 2021; that the present safety plan provided that contact between mother and father cannot happen when O is present; and that father had inquired of DHS whether mother could be present at father's home until O falls asleep at night, and that DHS explained to father that that type of contact between mother and father was "not appropriate" given the situation that occurred on January 30, 2021. Evidence was also received reflecting that mother submitted a negative urinalysis test on February 5, 2021. After hearing arguments from the parties, the court adhered to its prior order regarding psychological evaluations, explaining:

> "I do want the psychological evaluation to understand * * * what way do I want to put it, something that [child's counsel] said. You know, * * * what they really need is help making a parenting plan and—and then, you know, understanding the relationship.
>
> "Well, I think that certainly the understanding the relationship, there is something that I don't think any of us quite understand about that and maybe they themselves don't understand that can definitely be harmful for this child. And so we need to get to the bottom of it."

Although the juvenile court's ruling does not explicitly state as much, we understand the juvenile court to have

determined that it had authority to order a psychological evaluation under both ORS 419B.337(2) and ORS 419B.387.[2]

## II.  ANALYSIS

During the pendency of this appeal, we decided *W. C. T.*, which clarified that a four-part standard governs a juvenile court's authority to order a psychological evaluation. 314 Or App at 776. That standard involves "several, related provisions of the juvenile code." *Id.* at 756. Under that standard,

> "the court may order a psychological evaluation of a parent, after an evidentiary hearing, by making findings that:
>
> "1.   The psychological evaluation is for a service that is rationally related to the findings that bring the child into the court's jurisdiction (ORS 419B.337(2); ORS 419B.343(1)(a));
>
> "2.   The psychological evaluation is a predicate component of treatment or training of a parent (ORS 419B.387);
>
> "3.   There is a need for treatment or training to correct the circumstances that caused the jurisdictional findings or to prepare the parent for the child's return (ORS 419B.343(1)(a); ORS 419B.387); and
>
> "4.   The parent's participation in such treatment or training is in the best interest of the child (ORS 419B.387)."

*Id.* at 776.

---

[2]  ORS 419B.337(2) provides:

"The court may specify the particular type of care, supervision or services to be provided by the Department of Human Services to wards placed in the department's custody and to the parents or guardians of the wards, but the actual planning and provision of such care, supervision or services is the responsibility of the department. The department may place the ward in a child care center authorized to accept the ward."

ORS 419B.387 provides:

"If the court finds in an evidentiary hearing that treatment or training is needed by a parent to correct the circumstances that resulted in wardship or to prepare the parent to resume the care of the ward, the court may order the parent to participate in the treatment or training if the participation is in the ward's best interests."

Additionally, ORS 419B.343(1)(a) specifies that DHS shall ensure that the case planning in any case

"[f]or the reunification of the family bears a rational relationship to the jurisdictional findings that brought the ward within the court's jurisdiction under ORS 419B.100."

On appeal, mother argues, among other points, that the juvenile court was without authority to order a psychological evaluation under ORS 419B.337 because the record was "insufficient to show that a psychological evaluation is 'rationally related' to the established jurisdictional bases." Mother maintains that "the trial court ordered mother to submit to a psychological evaluation for a reason unrelated to the jurisdictional bases—to assist in developing a parenting plan and understanding mother's and father's relationship," but that "Mother's and Father's relationship is not an established basis for juvenile court jurisdiction as to mother." Additionally—although not necessary to our analysis in this case—we note that mother argues that the juvenile court was without authority to order a psychological evaluation under ORS 419B.387 because the record is insufficient to show that "a psychological evaluation was a component of treatment or training that mother needed to overcome the jurisdictional bases or effect reunification."

The state, for its part, argues "the combination of three facts supports the juvenile court's order requiring mother to participate in a psychological evaluation"— *viz:* "(1) the jurisdictional basis that mother's substance abuse interfered with her ability to safely care for [O]; (2) her inability to adequately address her substance abuse over the past year; and (3) her taking [O] from father while she was high and not being willing to return [O]." In the state's view, from that "constellation of facts," the juvenile court "could determine that mother needed to participate in a psychological evaluation to aid in her drug treatment, improve her relationship with father, and therefore be able to safely parent [O]." That is, the state contends that the "juvenile court permissibly ordered mother to participate in a psychological evaluation because it was needed to help her address her substance abuse, which, in turn, would help her and father to safely parent [O]."[3]

---

[3] The state takes the position that because "the record here is sufficient to support the juvenile court's order under ORS 419B.387, this court does not have to reach mother's argument[] *** that the order was not supported under ORS 419B.337."

We note that the state's briefing on appeal was filed prior to our clarification in *W. C. T.* that, to order a psychological evaluation, a juvenile court must find that "[t]he psychological evaluation is for a service that is rationally related to

In this case, we conclude that the juvenile court erred in ordering mother to undertake a psychological evaluation. As set forth above, a juvenile court is authorized to order a psychological evaluation only where such an evaluation "is for a service that is rationally related to the findings that bring the child into the court's jurisdiction." *W. C. T.*, 314 Or App at 776. That is because the "gist of ORS 419B.337(2) is that the juvenile court may specify the services that will comprise the case plan," and "ORS 419B.343(1)(a) requires that services be rationally related to jurisdictional findings." *Id.* at 772.

We have previously explained that "the bar is low to establish a rational relationship between a psychological evaluation of a parent and a jurisdictional basis." *Dept. of Human Services v. K. J.*, 295 Or App 544, 549, 435 P3d 819 (2019). Indeed, "[t]he provision of psychological services to parents is not limited to cases in which a parent's mental health condition is a basis for jurisdiction." *Dept. of Human Services v. A. F.*, 295 Or App 69, 75, 433 P3d 459 (2018); *see also id.* at 72, 79 (concluding that "the record adequately establishes a rational relationship, for purposes of ORS 419B.337(2), between ordering a psychological evaluation of mother" and the jurisdictional bases—*viz.*, (1) "'mother has exposed child to unsafe and unsanitary living conditions, including exposure to drugs, drug paraphernalia, and unsafe persons'; [and] (2) 'mother has left child with unsafe caregivers without making appropriate plans for the care of the child.'"). *W. C. T.* did not alter the "rational relationship" test.

Nevertheless, the "'rational relationship' test does not mean any proof suffices." *W. C. T.*, 314 Or App at 765 n 6. For example, in *K. J.*, we reversed and remanded after a juvenile court ordered a psychological evaluation, concluding that the initial problems about physical health and housing concern were not things to be addressed by a psychological

the findings that bring the child into the court's jurisdiction" pursuant to ORS 419B.337(2) and ORS 419B.343(1)(a), *and that* "[t]he psychological evaluation is a predicate component of treatment or training of a parent" and "there is a need for treatment or training to correct the circumstances that caused the jurisdictional findings or to prepare the parent for the child's return" pursuant to ORS 419B.387 and ORS 419B.343(1)(a). 314 Or App at 776.

evaluation. 295 Or App at 551-52; *see also Dept. of Human Services v. F. D. B.*, 289 Or App 633, 634, 407 P3d 982 (2017) (accepting DHS concession that the order for a psychological evaluation did not bear a rational relationship to the bases of jurisdiction); *Dept. of Human Services v. D. W. W.*, 278 Or App 821, 822, 379 P3d 796 (2016) (expressing rational relationship standard and accepting DHS concession).

In this case, as noted above, jurisdiction as to mother was established via mother's admissions that (1) "mother's substance abuse interferes with her ability to safely parent [O]" and (2) "[w]hile in the care of the parents the child tested positive for methamphetamine and the mother was not able to protect the child from the unsafe environment." But we do not understand the juvenile court to have ordered mother to participate in a psychological evaluation for reasons related to concerns regarding mother's substance abuse and inability to protect O from the unsafe environment that caused O to test positive for methamphetamine. Instead, the juvenile court's ruling reflects that it believed a psychological evaluation would assist in "understanding the relationship" between mother and father, as there was something about the relationship the juvenile court did not "quite understand," which the juvenile court found could "definitely be harmful" to O. The juvenile court also observed that what mother and father "really need is help making a parenting plan," and noted that perhaps an understanding of mother and father's relationship would assist in making such a plan.

We thus understand the juvenile court's ruling to be consistent with that portion of DHS's request that the juvenile court order a psychological evaluation because it would be beneficial in "assessing the relationship between the father and the mother" and that it would be "helpful to have a fuller understanding of" mother and father's relationship. But that is not a psychological evaluation "for a service that is rationally related to the findings that bring the child into the court's jurisdiction." *W. C. T.*, 314 Or App at 776. Consequently, we reverse and remand.[4]

_____

[4] We express no opinion on whether the "constellation of facts" pointed to by the state would have allowed the juvenile court to "determine that mother needed

Reversed and remanded.

---

to participate in a psychological evaluation to aid in her drug treatment," as the state contends. The difficulty with the state's position is that, given the juvenile court's ruling, we do not understand the juvenile court to have ordered a psychological evaluation of mother due to concerns regarding mother's substance abuse. Rather, the juvenile court's concern was the relationship between mother and father, and the potential harm to O caused thereby.

To the extent the state can be understood to argue that we should infer that the trial court made an implicit finding that mother's substance abuse was the cause of her altercation with father, and her relationship difficulties with father, we do not do so. We attribute a finding of fact only where "we can deduce that the trial court's chain of reasoning must necessarily have included that fact as one of its links." *State v. Lunacolorado*, 238 Or App 691, 696, 243 P3d 125 (2010), *rev den*, 350 Or 530 (2011). That is not the case here, where the trial court expressly stated it was ordering the psychological evaluation to reach an understanding concerning mother and father's relationship.