Argued and submitted August 21, affirmed October 8, 2014, petition for review denied March 5, 2015 (356 Or 837)

In the Matter of S. F.-H.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

H. H.
and R. F.,
*Appellants.*

Multnomah County Circuit Court
2012811991;
Petition Number 109587M;

In the Matter of H. F.-H.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

H. H.
and R. F.,
*Appellants.*

Multnomah County Circuit Court
2012811992;
Petition Number 109587M;

A156147

337 P3d 929

Laura S. Anderson argued the cause and filed the brief for appellant H. H.

George W. Kelly argued the cause and filed the brief for appellant R. F.

Michael Casper, Senior Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Karla H. Ferrall, Assistant Attorney General.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Lagesen, Judge.

LAGESEN, J.

LAGESEN, J.

Mother and father (collectively, parents) each appeal a juvenile court judgment taking jurisdiction over their sons, S and H, under ORS 419B.100(1)(c). The court took jurisdiction of the children based on its determination that their condition and circumstances endangered their welfare because (1) father had caused a nonaccidental injury to H that amounted to child abuse and resulted in "significant adverse consequences" for H; and (2) mother refused to acknowledge father's role in injuring H and, for that reason, was not capable of protecting the children from father. On appeal, mother and father each assign error to the juvenile court's finding that H's injury was nonaccidental; mother also contends that, even if the injury was nonaccidental, the juvenile court erred in finding that the children's circumstances endangered them. Both parents also assert that they have made a sufficient showing of inadequate assistance of counsel before the juvenile court so as to warrant a remand under *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 796 P2d 1193 (1990), for an evidentiary hearing on the adequacy of their lawyers' performances. We affirm the judgment of the juvenile court and decline to exercise our discretion to remand the case for an evidentiary hearing on parents' claim of inadequate assistance of counsel.[1]

## I. BACKGROUND

Mother and father have been in a relationship since approximately 2008. Their two sons, S and H, were

---

[1] Following oral argument and the submission of these appeals, the Department of Human Services (DHS) filed a "Notice of Potential Mootness" to alert us that the juvenile court had entered a judgment terminating jurisdiction. Mother and father separately responded, arguing that the judgment terminating jurisdiction does not moot this appeal because, if this court dismisses parents' appeals without deciding the case on the merits, the persistence of the initial jurisdictional determination will (1) limit father's access to, and contact with, his children; (2) have collateral effects on mother's particular employment prospects as a licensed school psychologist, school counselor, and mental-health counselor; (3) affect any future investigation of the children's circumstances; and (4) result in continued and profound social stigma. Consistent with the decisions in *Dept. of Human Services v. G. D. W.*, 353 Or 25, 32, 292 P3d 548 (2012), and *State ex rel Juv. Dept. v. L. B.*, 233 Or App 360, 363-65, 226 P3d 66 (2010), we agree with parents that this appeal is not moot. In particular, we note that the judgment terminating jurisdiction incorporates restrictions on father's access to children and parenting time. At a minimum, were we to rule in favor of parents on this appeal, that ruling could provide a basis for removing those restrictions.

born in 2010 and 2012, respectively. Father is a commercial fisherman who regularly is away from home for periods of approximately two months. Mother has advanced degrees in counseling and psychology and, before having children, worked as a mental-health counselor, a school counselor, and a school psychologist. She stopped working outside the home at some point after her children were born.

When H was approximately three weeks old, he suffered his first injury while in father's care: a broken femur. According to father, the injury occurred while father was holding H in one arm and reaching up for a bottle for H with the other arm. H squirmed out of father's grasp, and father caught H by the leg as he fell, causing the child's leg to break. Father took H to the emergency room, where doctors treated the break with a Pavlik harness. Although long-bone injuries are generally concerning for child abuse in nonambulatory children under the age of 14 months, the emergency room doctors thought that father's report of how the injury occurred seemed consistent with the injury and did not suspect child abuse at the time.

A little over three and one-half months later—six days after father had returned home after being away for work for almost three months—H suffered his second injury while in father's care. H had received vaccinations several days earlier and had been vomiting periodically since their administration. After one episode of vomiting, father took H upstairs to clean and change him. H stopped breathing while father was in the process of changing him. Father called to mother, who was in a different room at the time, for assistance. Mother contacted 9-1-1; father began administering CPR to H.

H was taken to the emergency room and later admitted into intensive care. Brain imaging tests revealed that H was suffering from bilateral subdural hematomas. An ophthalmological exam revealed that H also was suffering from significant bilateral retinal hemorrhages. H experienced seizures in the days after he was admitted to the hospital.

Because H's presentation at the hospital was indicative of nonaccidental trauma, the hospital alerted its CARES team of the need to assess whether H's injuries resulted from

abuse. Dr. Copeland, a child-abuse pediatrician for CARES Northwest, was assigned to evaluate H's case. After reviewing H's records, and consulting with the doctors involved in H's treatment, she determined that H was suffering from an acute subdural hemorrhage, brain injuries, and retinal hemorrhages. The particular pattern of H's retinal hemorrhages was consistent with severe trauma. Combined with the evidence of the subdural hematomas, the evidence of the retinal hemorrhages was "indicative of a severe inflicted injury," particularly in "a young, nonmobile infant with no other available history to explain those findings." The fact that H's status had deteriorated suddenly further indicated to Copeland that H's condition was the result of an inflicted injury.

Concerned that H had been abused and by parents' failure to acknowledge that abuse, the Department of Human Services (DHS) petitioned for jurisdiction over S and H on the ground that their condition and circumstances endangered them. The children were placed in the temporary custody of DHS, and mother's parents moved in with parents to serve as safety service providers for the children pending the outcome of the jurisdictional trial.

At the jurisdictional trial, mother and father both denied that father had injured H. Mother testified that, even though father had assaulted her in the past, she did not believe that father had the capacity to injure a child and did not believe that father injured H, and that nothing except an admission by father would cause her to change her mind about the source of H's injuries. She further testified that, if, at the close of trial, the court determined that DHS had not established that jurisdiction was warranted, she anticipated that the family's life would be the same, except that her parents would not be living with them.

The trial consisted in large part of competing testimony from doctors regarding the source of H's injuries. Among other witnesses, DHS called Dr. Shelak, who was working in the pediatric intensive care unit at the time that H was admitted with the brain injury; Dr. Elia, the family's primary pediatrician until a few months before trial; Copeland; and Dr. Achterman, the orthopedic surgeon who

had treated H in connection with the femur fracture. Shelak testified that, in her opinion, H's injury resulted from "an acute event in some period of hours before his presentation."

Elia testified that, based upon his review of the records of H's hospitalization, and on his own training and experience, he "agree[d] with the diagnosis of abusive head trauma." Elia also testified that, after his injury, H "had multiple regressions in developmental skills." Specifically, H lost the ability to eat; lost his head and neck strength, which had been good before the injury; and, although he continued to react to neurological stimulation, H stopped seeking out such interactions. Before his injury, H was developmentally on track in all respects; afterwards, he was not.

Copeland testified that she had concluded to a reasonable degree of medical certainty that H's injuries resulted from "a significant inflicted injury." Apparently in anticipation of parents' defense theory, Copeland also testified as to why other possible explanations for H's injury, including a chronic subdural hematoma and the blood disorder known as Von Willebrand's Disease, could not account for H's condition, given H's particular medical history.

Achterman testified that, at the time that he had treated H's femur fracture, he had thought that father's explanation of the injury was "viable." Achterman testified that his opinion had changed, however, as a result of H's subsequent injuries. He explained that, "in my experience of 30 plus years, when you have two events like that, the likelihood that it is not nonaccidental trauma is minuscule," particularly where both injuries occurred only months apart while H was in father's care.

Mother and father[2] called Dr. Recht, a pediatric hematologist; Dr. Karr, a pediatric ophthalmologist; and Dr. Green, a doctor who specializes in children's disorders, each of whom evaluated or treated H following his brain injury. In addition, mother and father presented expert

---

[2] The transcript identifies mother as the person who called Recht, Karr, Green, and Jollo. However, parents were unified in their presentation of their theory of defense below—that father was not the source of H's injuries—and it appears that Recht, Karr, Green, and Jollo were all called to support that theory. Thus, we refer to them as parents' witnesses, not just as mother's witnesses.

testimony regarding the cause of H's brain injury from Dr. Jollo.

Recht testified that H had a blood disease known as Von Willebrand's Disease, which causes him to bleed longer than other people when he is injured. Recht opined that that disease would need to be taken into account in assessing whether H's injuries resulted from abusive head trauma. On cross-examination, however, Recht acknowledged that it would be "vanishingly rare" for Von Willebrand's Disease to explain H's condition, given his belief that H suffered from a "less severe" form of the disease. Karr similarly testified that blood disorders, including leukemia, can cause retinal hemorrhages. However, on cross-examination, Karr conceded that, given the particular pattern of H's retinal hemorrhages, and assuming that H did not, in fact, have leukemia, it was "probably greater than 90 percent likely" that the cause of H's hemorrhages was abusive head trauma.

Green testified that H was a medically vulnerable or fragile child, and that, in his opinion, it was possible that H's injuries resulted from H's vulnerabilities rather than from abuse. In particular, Green opined that, given H's vulnerabilities, H's hematomas and retinal hemorrhages possibly resulted from insignificant or accidental trauma. According to Green, H's injuries could have resulted from CPR or even from the vomiting that H experienced in the days before his injury.

Finally, Jollo testified that he had reviewed H's medical records, as well as mother's prenatal records related to her pregnancy with H. Jollo testified that there is skepticism in the medical community as to whether the presence of acute subdural hematomas and retinal hemorrhages are indicative of abusive head trauma. He also testified that, based on his review of the medical records associated with H, he had concluded that H suffered from chronic subdural hematomas and hygromas that had been present at least since birth, and that an acute cardiovascular event possibly had led to the acute subdural hematomas and retinal hemorrhages identified when H was hospitalized. Jollo testified that he could not be certain what caused the acute bleeding, but that it was also possible that the vaccinations triggered

it. Although Jollo could not exclude the possibility that H's injuries resulted from a traumatic event, including abuse, he thought that it was more likely than not that H's injuries were the result of H's chronic subdural hematomas.

At the close of trial, the juvenile court found that jurisdiction was warranted. The court noted that, although mother should be commended for the lengths to which she had gone to remedy the harm to H as a result of his injury, "we need to all remember that none of those [lengths] would have been necessary if he hadn't been hurt in the first place." It then found that the evidence established that the children's condition and circumstances endangered them:

> "And I think the overwhelming weight of the evidence in this case, the persuasive evidence in this case by experienced—experienced and qualified witnesses is that this was a non-accidental injury that occurred while in the care of parents, more particularly the father, which constitutes child abuse of [H] and has caused him significant consequences, and that the children are both at risk because the mother is unable or unwilling to believe that the children are at risk when with the father."

Both parents timely appealed.

## II. STANDARD OF REVIEW

Mother and father each request that we review *de novo*. We decline that request. Although the key factual finding that parents challenge on appeal was central to the juvenile court's jurisdictional determination, this is not the type of "exceptional" case in which we should exercise our discretion to displace the juvenile trial court as factfinder and determine the facts ourselves from a paper record, without the opportunity to observe the witnesses and their demeanors on the stand. *See Dept. of Human Services v. J. G.*, 260 Or App 500, 502-03, 317 P3d 936 (2014). Accordingly, we review the juvenile court's factual findings to determine whether those findings are supported by any evidence in the record and review its legal conclusions for legal error. *Id.* at 504.

## III. ANALYSIS

Mother and father first contend that the juvenile court erred by taking jurisdiction because, in their view, the

evidence does not support the juvenile court's finding that H's brain injury resulted from abuse by father. We disagree. As noted, a number of medical professionals testified that H's injuries resulted from nonaccidental trauma. Even Karr, the pediatric ophthalmologist called by parents, testified that it was more than "90 percent likely" that the particular pattern of retinal hemorrhages suffered by H was caused by abuse. Moreover, the evidence of the circumstances of H's injuries also supports the finding that H's injuries were caused by father's abuse. In particular, the facts that (1) H broke his femur shortly after birth while in father's care; (2) father left shortly thereafter for nearly three months, during which time H did not suffer injuries; and (3) within a week of father's return, H suffered a traumatic head injury while in father's care permit the reasonable inference that father caused H's injuries through abuse.

Mother next asserts that, even if the juvenile court correctly found that H's injury resulted from father's abuse, it nonetheless erred in concluding that the children's circumstances endangered them so as to warrant jurisdiction. She argues that the evidence shows that she is a skilled, caring, and engaged parent, and that, as a result, S and H are not in dangerous circumstances. She argues further that the fact that she does not believe father caused H's injuries is insufficient to permit the conclusion that S and H are endangered, in the light of the evidence of mother's parenting skills. Again, we disagree.

Whether a child is endangered so as to warrant the exercise of jurisdiction turns on whether, "under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *Dept. of Human Services v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010) (internal quotation marks omitted). We conclude that that standard is met here. Although the record demonstrates that mother is an engaged and caring parent, father caused a severe brain injury to H, notwithstanding mother's parental abilities. Mother nonetheless continues to reside with father, is adamant that father did not injure H, and is unwilling to accept the medical evidence regarding the source of the injuries to H. Mother testified that, if DHS were no longer involved in

the family's life, she would continue to believe that father did not harm H, she would be relieved to have DHS out of the family's life, and the family would "probably function relatively the same except for my parents wouldn't be there." Those circumstances create a reasonable likelihood of harm to S and H. As the juvenile court found, because mother does not believe that father played a role in harming H, she does not perceive the need to take steps to protect her children from father. That, in turn, creates a reasonable likelihood that mother will leave S and H unsupervised in father's care, because that is what mother did before DHS became involved with the family, and that father will again inflict a significant injury on one of the children—particularly given that, as of the time of trial, father, like mother, had not acknowledged his own role in H's injuries.

Finally, in the alternative to their arguments challenging the merits of the juvenile court's decision, parents also assert that their lawyers below rendered inadequate assistance of counsel by not calling a particular expert witness—Dr. Barnes—to testify at the jurisdictional trial. Parents request that we remand the case to the juvenile court to permit them to further develop that claim. *See Geist*, 310 Or at 192 n 16. In support of that claim, parents have submitted extra-record material consisting of declarations from each parent averring that they wanted Barnes to testify at their trial; a declaration from a lawyer who has expertise handling cases involving infants with injuries that resemble those suffered by H stating that, in her opinion, Barnes's testimony would be helpful; and a letter to father's lawyer from Barnes summarizing Barnes's recommendations— following a review of "available" records associated with H— regarding possible avenues of investigation as to the causes of H's injuries. DHS opposes parents' request for a remand, contending that (1) statutory amendments have supplanted any authority that we had under *Geist* to remand a case for development of a claim of inadequate assistance of counsel; (2) the statutory right to adequate counsel established by *Geist* does not apply where, as here, parents have retained their own lawyers; (3) the procedure contemplated by *Geist* applies only if parental rights are terminated and does not apply at the jurisdictional stage of a juvenile case; and

(4) parents have not shown that their lawyers performed inadequately by not calling Barnes.

We assume without deciding that the statutory amendments identified by the state have not foreclosed our discretion to remand a case for evidentiary development of a claim of inadequate assistance of counsel in the manner contemplated by *Geist*. We also assume without deciding that the right to the adequate assistance of counsel applies even where a parent's lawyer is retained and that it applies at all stages of a juvenile case, including the jurisdictional stage. We nonetheless decline to exercise our discretion to remand the case here.

In *Geist*, the Supreme Court cautioned that a court should authorize an evidentiary hearing on a claim that counsel was inadequate for failing to call a particular witness in a juvenile case "if ever, only when a parent raises a *substantial* question" concerning the issue. *Id.* (emphasis in original). The court further explained what a parent would have to show to raise a "substantial" question that would warrant an evidentiary hearing:

> "Before authorizing an evidentiary hearing, a court doubtless would require a threshold showing of specific allegations, including the names of witnesses to be called, the expected substance of their testimony, and an explanation of how that testimony would show that trial counsel was inadequate."

*Id.*

Here, parents' extra-record submissions to us do not reveal what the expected substance of Barnes's testimony at trial would have been; those submissions show only that Barnes had conducted a preliminary evaluation of the case, that Barnes concluded that the images that he reviewed were not specific to nonaccidental trauma and that there were other potential causes of H's injuries, and that Barnes recommended that those other potential causes be further evaluated by clinical experts. Absent a clearer picture of what, exactly, Barnes's testimony would have contributed to the trial—including a clearer picture of what Barnes would have said if asked to opine on the likelihood that H's injuries resulted from abuse—we are not persuaded that there is a

"substantial question" as to whether parents' lawyers performed inadequately by not calling Barnes. Accordingly, we deny parents' request to remand the case for an evidentiary hearing on their claim of inadequate assistance of counsel. Our denial of parents' request is without prejudice to parents' ability to renew the request in the juvenile court.[3]

Affirmed.

---

[3] DHS argues in its brief, and conceded at oral argument, that parents would be entitled to raise their claim of inadequate assistance of counsel through a motion under ORS 419B.923(1).