482 May 14, 2025 No. 427

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of M. L.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*
M. L.,
*Respondent,*
*v.*
K. B. L.,
aka K. L.,
*Appellant.*

Columbia County Circuit Court
24JU01603; A184809 (Control)

In the Matter of K. L.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*
K. L.,
*Respondent,*
*v.*
K. B. L.,
aka K. L.,
*Appellant.*

Columbia County Circuit Court
24JU01604; A184810

In the Matter of B. L.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*
B. L.,
*Respondent,*
*v.*

K. B. L.,
aka K. L.,
*Appellant.*

Columbia County Circuit Court
24JU01605; A184811

Denise E. Keppinger, Judge.

Argued and submitted February 26, 2025.

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

Benjamin Gutman, Solicitor General, argued the cause for respondent Department of Human Services. Also on the brief was Dan Rayfield, Attorney General.

Erica Hayne Friedman filed the brief for respondents M. L., K. L., and B. L. Also on the brief was Youth, Rights & Justice.

Before Shorr, Presiding Judge, Powers, Judge, and Pagán, Judge.

POWERS, J.

Reversed and remanded for entry of jurisdictional judgments omitting allegations 4(D) and 4(E) as bases for jurisdiction; otherwise affirmed.

**POWERS, J.**

In this consolidated juvenile dependency case, mother challenges judgments asserting jurisdiction over her three children. The court took jurisdiction based on allegations related to mother's substance abuse and exposing the children to an adult who injured one of them. In 24 assignments of error, mother makes two primary arguments. First, in assignments of error one through six, mother asserts that the juvenile court erred by admitting toxicology lab reports of the children under the business records exception to hearsay, OEC 803(6), and by admitting testimony about those lab reports. Second, in assignments of error seven through 24, mother argues that the juvenile court erred in asserting dependency jurisdiction because the department failed to prove that mother exposed the children to a cognizable risk of harm. As explained below, we conclude that the juvenile court erred by admitting the lab reports and related testimony and that the court erred in asserting jurisdiction in part. Accordingly, we affirm the jurisdictional judgments in part and reverse in part.

Absent *de novo* review, which mother does not seek, we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We are bound by the juvenile court's express and necessarily implied findings of fact, if supported by any evidence. *Id.* at 639-40. We recite the underlying facts with that standard of review in mind.

Mother has three children, M, K, and B. At the time of the underlying jurisdictional trial in 2024, M was five years old, K was four, and B was two. In 2022, the juvenile court originally took jurisdiction over the children after B tested positive at birth for various controlled substances. Father died of an accidental drug overdose a few months later. Mother completed family treatment court, and in January 2024, the court dismissed jurisdiction because it concluded that mother addressed the issues that brought the children into care.

Less than a month after the juvenile court dismissed the case, the Department of Human Services (the department or DHS) received a hotline call that prompted a child-welfare investigation that led to new dependency petitions. DHS investigator, Lovett, interviewed mother and thought that mother "appeared anxious" and that it was "kind of hard [for mother] to focus." Lovett urged mother to get a drug and alcohol assessment but did not remove the children.

One month later, the department received another call, and Lovett went to inspect mother's residence. When Lovett arrived, mother appeared to be under the influence of drugs and was confused about B's whereabouts. Mother initially told Lovett that B was napping upstairs, but B was not there when Lovett went inside. Mother then remembered that B was at the babysitters. While in the home, Lovett saw small alcohol bottles all around the apartment that could have been within the children's reach, including one that was full and uncapped. Additionally, Lovett saw a "whole setup for injecting substances," which she described as a "fix kit," including a razor blade, a spoon, used syringes, and a water bottle that had cocaine residue on the outside, sitting in the apartment's only working bathroom. Mother acknowledged that the syringes were dangerous for the kids but denied that they were hers and told Lovett that the syringes belonged to someone else whom she just let use her shower.

A few days later, DHS received a report that M had injuries. Lovett went to M's school and reported that he had a "goose egg" on his head. M told Lovett that his mother's friend, Marsh, who occasionally stayed the night at their home, was in their home and kicked M, which caused M to fall down the stairs. In addition to Lovett, M told several other adults about Marsh kicking him and falling down the stairs. When mother was confronted about M's injury, mother told Lovett that the children "hurt each other. All these fucking kids have bruises on their heads from each other." When mother was told by Lovett that Marsh would need to be kept away from the children, she was upset and said "no," and she referred to Marsh as "all I have."

At Lovett's urging in response to M's injuries, mother drove all three children to the Amani Center, a

child advocacy center that conducts forensic interviews and medical exams. Lovett observed that, at this time, mother seemed to be impaired but allowed her to drive the children because there was no "pickup order yet." Reardon, a family nurse practitioner at the Amani Center, examined the children and noted that all three children had scratches and bruises. Reardon, who described the children as generally well-groomed and otherwise well-cared for, took urine samples from the three children and a hair sample from K, all of which she sent to a lab for testing. While at the Amani Center, Lovett obtained an order authorizing her to remove the children from mother's care and place them in foster care, at which point mother told Lovett, "My children are fucking liars."

Antonucci, a DHS permanency worker, also observed mother under the influence of substances several times, including during one of mother's family visits with the children. In one instance, while Antonucci was walking with mother, mother seemed unaware that she was holding B while carrying him down a hallway, and later mother dropped B 14 to 16 inches into his car seat.

DHS petitioned the juvenile court to take jurisdiction based on five allegations: 4(A), mother exposed the children to an adult (Marsh) in her home who caused injury to M; 4(B), mother's substance abuse interferes with her ability to safely parent the children; 4(C), father is deceased; 4(D), K and B tested positive for controlled substances while in the care of mother; and 4(E), despite receiving treatment for an admitted substance abuse allegation in a prior dependency case, including inpatient treatment and participating in specialty court, K and B tested positive for controlled substances approximately 10 weeks after dismissal of the prior dependency case and mother has been observed to be under the influence of controlled substances.

At trial, the juvenile court accepted Reardon as an expert in diagnosing child medical maltreatment. DHS introduced Reardon's reports, which included copies of the lab reports documenting the children's drug tests. Mother objected to the lab reports and related testimony regarding those reports on hearsay grounds. The court overruled

the objection, citing the business records hearsay exception, OEC 803(6), and admitted the exhibits reasoning that the lab reports were part of the routine process informing Reardon's opinion. Reardon proceeded to testify that she conducted a forensic medical evaluation of all three children and that she collected the hair and urine samples, but that she did not have any involvement in running those samples or preparing the lab reports. Reardon concluded that the children had recently been exposed to substances given that B's urine tested positive for amphetamines and methamphetamines and K's hair sample tested positive for methamphetamines and marijuana.

Mother also testified at trial. Mother denied that Marsh was an important person to her. When asked if she believed M that Marsh hurt him, she answered yes, but she also provided conflicting testimony, including: "[y]es and no, because I always believe something my child comes and tells me, right? However, *** it was a little hard to believe," that M has "stated things to me *** that are not true," that M has "falsely accused people before," and that she "can't a hundred percent say my kid is lying. What I'm saying is [M] has been known to say things that are not true."

Ultimately, the juvenile court concluded that the department established all the bases for jurisdiction.[1] Mother timely appeals.

In mother's first six assignments of error, mother asserts that the juvenile court erred by admitting the lab results and testimony about the lab results. We review whether evidence qualifies under the OEC 803(6) business records hearsay exception for errors of law. *Arrowood Indemnity Co. v. Fasching*, 369 Or 214, 247, 503 P3d 1233 (2022).

Mother asserts that the lab reports do not qualify as business records because it is undisputed that Reardon did not have any knowledge about how the lab reports were

_____

[1] Although the judgments note that the juvenile court asserted jurisdiction based on allegations "3A" through "3E," the court orally referred to the allegations as "4A" through "4E," which tracks the numbering in the petition. Like the parties' briefs on appeal, we similarly use the numbering from the petitions and assume that the notations in the judgments are scrivener's errors.

generated, and the fact that she relied on the lab reports for her own purpose does not establish anything about their creation, which is what OEC 803(6) requires. The department concedes that the court erred by admitting the lab reports as business records, but it argues that the reports were admissible for the nonhearsay purpose of explaining the foundations for Reardon's expert opinions, thus any error is harmless. In her reply, mother asserts that the testimony is inadmissible because, although an expert may testify about inadmissible evidence to provide the foundation necessary to explain the expert's opinion, it is not admissible for its truth, and here, the court considered the lab reports for their truth. Further, mother argues Reardon's opinion was nothing more than a recitation of the lab reports.

We first turn to the lab reports themselves. Hearsay evidence, which is defined in OEC 801(3) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," is generally inadmissible. *See* OEC 802. Unlike statements made in court, which are subject to immediate cross-examination and where the trier of fact can observe the demeanor of the witness who swears or affirms to tell the truth, hearsay evidence is presumptively excluded because of its untrustworthiness. *Arrowood Indemnity Co.*, 369 Or at 222. One exception to hearsay in the evidence code is what is commonly known as the business record exception. Under OEC 803(6), qualifying business records are exempt from the bar on hearsay evidence if there is testimony that the records were "kept in the course of a regularly conducted business activity" and that it is "the regular practice of that business activity" to make the records. Thus, "a party seeking to utilize the business records exception must present evidence about the record-making practices of the business that created the record." *Arrowood Indemnity Co.*, 369 Or at 226. Here, no such foundation was established. Reardon did not create the reports or have any insight into how the reports were generated. Accordingly, we accept the state's concession that the juvenile court erred in admitting the lab reports under OEC 803(6).

We turn next to mother's objection to Reardon's testimony. OEC 703 allows an expert witness to offer an opinion based on inadmissible evidence, as long as the information is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data." Importantly, however, "OEC 703 does not render otherwise inadmissible evidence admissible merely because it was the basis for the expert's opinion." *McCathern v. Toyota Motor Corp.*, 332 Or 59, 70, 23 P3d 320 (2001). An expert may testify about the inadmissible evidence only "to provide the foundation necessary to explain [the expert's] opinions, not for its truth." *Id.* Moreover, an expert may not merely parrot the statement of another for its truth. *State v. Bowman*, 373 Or 213, 227, 564 P3d 121 (2025). Accordingly, if a testifying expert is relying entirely on the conclusions reached by other technicians, that testimony is not allowed because it would simply be parroting hearsay statements. *Id.* at 226 (citing Laird C. Kirkpatrick, *Oregon Evidence* § 703.03[3], 690-91 (7th ed 2020)).

Here, although the lab results might be the type of information that a nurse might reasonably rely upon to form an opinion about potential child medical maltreatment, Reardon did not testify to the results of the lab reports for the purpose of explaining her own diagnostic opinion. Rather, her conclusion relied entirely on the conclusions reached by other technicians. That is, DHS elicited and relied upon that testimony for the truth of the matter asserted. For instance, the department referenced the testimony and lab results in closing arguments, asserting that "the evidence also showed through expert testimony that two of her children tested positive for controlled substances," and "we do have children through lab urinalysis and hair samples who have tested positive for controlled substances." Ultimately, because Reardon was relying entirely on the conclusions reached by other technicians, the trial court erred in allowing her testimony because it was merely parroting inadmissible hearsay statements.

In sum, we agree with mother's arguments that the juvenile court erred in admitting the lab reports as exhibits and in allowing Reardon to testify over her hearsay objection

about the lab results. Those errors are not harmless. The effect of the court's evidentiary error becomes clear as we discuss mother's challenge to the merits of the dependency judgments.

Turning to the remaining assignments of error, mother asserts in a combined argument that the juvenile court was not authorized to assert dependency jurisdiction over each of her children because the department failed to prove that mother exposed the children to a cognizable risk of harm. We agree that the juvenile court erred in asserting jurisdiction in two instances and affirm the remaining portions of the jurisdictional judgments.

ORS 419B.100(1)(c) allows a juvenile court to assert dependency jurisdiction over a child whose "condition or circumstances are such as to endanger [a child's] welfare." The evidence must show "that the child's condition or circumstances expose the child to a current threat of serious loss or injury that is likely to be realized." *Dept. of Human Services v. A. W.*, 276 Or App 276, 278, 367 P3d 556 (2016). DHS has the burden of showing a nexus "between the parent's conduct or condition and a threat of harm to the child that exists at the time of the jurisdictional trial." *Dept. of Human Services v. C. A. M.*, 294 Or App 605, 615, 432 P3d 1175 (2018). A record may support a nexus if there is evidence that a parent does not believe that another person poses a risk of harm to a child, when that other person does pose such a risk. *See Dept. of Human Services v. K. V.*, 276 Or App 782, 792-93, 369 P3d 1231, *rev den*, 359 Or 667 (2016) (concluding that evidence that the father did not believe that there were issues with the mother's parenting that would have led to the child's injury supported the court's findings that the father was likely to fail to protect the child from the mother); *Dept. of Human Services v. H. H.*, 266 Or App 196, 204-05, 337 P3d 929 (2014), *rev den*, 356 Or 837 (2015) (noting that, because the mother did not believe that the father played a role in harming the child and did not perceive the need to take steps to protect her children from the father, there is a reasonable likelihood that the father would again inflict a significant injury on one of the children).

Applying those standards here, the record permits the juvenile court's assertion of jurisdiction based on allegation 4(A), that mother exposed the children to an adult (Marsh) in her home who caused injury to M, allegation 4(B), that mother's substance abuse interferes with her ability to safely parent the children, and allegation 4(C), that father is deceased. We further conclude that the evidence was insufficient to support the court's determination of jurisdiction based on allegations 4(D) and 4(E).

Both allegations 4(D), regarding K and B testing positive for controlled substances while in mother's care, and 4(E), which focuses on K and B testing positive for controlled substances shortly after the dismissal of the prior dependency case, rely on evidence that the children tested positive for controlled substances. As we explained above, the juvenile court erred in admitting both the lab reports and testimony from Reardon about the lab results. Although there is evidence that the children were exposed to controlled substances, such as mother's intoxication while caring for the children and the drugs and "fix kit" in the home, the evidence from the lab reports and the testimony are significant, if not dispositive, that the children tested positive for controlled substances. Thus, even when viewed in the light most favorable to the juvenile court's disposition, the evidence is insufficient to support the court's determination on those two bases for jurisdiction. Accordingly, we conclude that the juvenile court erred in asserting jurisdiction based on allegations 4(D) and 4(E).

As to allegation 4(A), the evidence adduced at trial was that M sustained a noticeable injury, a "goose egg" on his forehead, and mother continued to have difficulty articulating that she believes Marsh injured M. Even though M is young, M made consistent statements to a number of adults that he received the injury from Marsh. M was able to clearly articulate how he was injured, and those statements matched the injury and were made near the time of the injury. Further, when mother was confronted about M's injury, she referred to Marsh as "all I have" and became upset and said "no" when she was told Marsh could not be around the children. Although mother later testified that Marsh was not important to her, the department argues that

there is evidence that contradicts that statement. Viewing that evidence in the light most favorable to the juvenile court's disposition, there was sufficient evidence from which the court could conclude that mother exposed the children to an adult who caused injury to M. Further, there is evidence to support the finding that mother does not believe that Marsh injured M or seemingly perceive that Marsh is a danger to the children, which supports a determination that the children remain at risk of harm.

As to allegation 4(B), there is evidence that supports that mother's substance abuse interferes with her ability to safely parent the children. Mother admitted using alcohol and marijuana, including using marijuana on the morning of the trial, and Lovett and Antonucci both testified that they encountered mother while she was seemingly under the influence of intoxicants while interacting with her children. For example, while mother was intoxicated, mother was unaware of where B was, telling Lovett that B was inside but later realizing B was at the babysitters. Mother at one point was apparently unaware that she was holding B and later dropped B into a car seat. Further, alcohol bottles were strewn across the home, including an opened and uncapped full bottle of alcohol that could have been within reach of the children. There was also drug paraphernalia, including a rusty razor, spoon, used syringes, and a bottle that had cocaine residue on the outside, in the only working bathroom of the apartment.

On appeal, mother argues that evidence that a parent uses drugs is insufficient to establish jurisdiction without some theory, supported by the facts, as to how that use poses a risk to the child. *See, e.g.*, *A. W.*, 276 Or App at 280 (reversing a jurisdictional judgment based on the mother's substance abuse due to lack of evidence that the mother "used drugs while caring for [the child] or that her drug use had any effect on her parenting"). Here, however, we agree with DHS's argument that the evidence was sufficient given the evidence that mother was intoxicated and unaware that B was in her arms while carrying him down a hallway, and evidence of drugs, drug paraphernalia, and alcohol in areas where the children could reach. Ultimately, viewing the evidence in the light most favorable to the juvenile court's

disposition, there was sufficient evidence for the juvenile court to determine that mother's substance abuse interferes with her ability to safely parent the children.

As to allegation 4(C), it is undisputed that father is deceased. Although jurisdiction is not warranted over a child who has a parent that is capable for caring for the child safely, *Dept. of Human Services v. E. M.*, 264 Or App 76, 84-85, 331 P3d 1054 (2014), because we conclude that the state sufficiently proved allegations 4(A) and 4(B), the juvenile court did not err in establishing allegation 4(C).

In sum, the evidence was sufficient to support the juvenile court's jurisdiction over the three children based on allegations 4(A) through (C), but insufficient to support jurisdiction based on allegations 4(D) and 4(E). Accordingly, we reverse and remand for the court to enter judgments establishing jurisdiction based on allegations 4(A) through (C) only.

Reversed and remanded for entry of jurisdictional judgments omitting allegations 4(D) and 4(E) as bases for jurisdiction; otherwise affirmed.