802 June 24, 2026 No. 571

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of A. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. S.,
aka A. R. K. S., B. L. W.-S., and J. K. S.,
*Appellants.*

Washington County Circuit Court
24JU06133; A187732 (Control), A187801, A187802

Michele C. Rini, Judge.

Argued and submitted March 19, 2026.

Kimberly A. Quach argued the cause for appellant father. Also on the briefs was Quach Family Law, P. C.

Matthew Muenzen argued the cause for appellant child. On the brief was Aron Perez-Selsky.

Emily N. Snook, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Paul L. Smith, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

PAGÁN, J.

Reversed.

Aoyagi, P. J., concurring.

**PAGÁN, J.**

In this juvenile dependency case, mother, father, and child appeal from a judgment asserting dependency jurisdiction over child, which arose from a series of injuries suffered by the infant child. Mother, father, and child each assert the same assignment of error: that the trial court erred when it found dependency jurisdiction over child. While appellants' particular arguments vary, they all assert that the facts found by the court were insufficient evidence to show a current threat of serious loss or injury to the child that is reasonably likely to be realized. We agree with appellants and conclude that, giving deference to the trial court's findings that parents did injure child (given the standard of review), the facts found by the juvenile court did not support the determination that such injuries or the parents' behavior posed a current threat of serious loss or injury to the child. Accordingly, the trial court erred when it found dependency jurisdiction over child. We thus reverse.

As discussed at length in the concurrence, absent *de novo* review—which the parties do not seek—we review a trial court's finding of jurisdiction as follows. We

"(1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied."

*Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013); *see also State v. Lunacolorado*, 238 Or App 691, 696, 243 P3d 125, *rev den*, 350 Or 530 (2010) (discussing limitations on implied findings of fact). We address the facts with that standard of review in mind.

Mother and father are married. Mother is a child therapist. Father is a salesman. Child was born in May 2024 and is an only child. Child had a number of medical issues

at birth. He had allergies and a swallowing problem that resulted in him being malnourished, a cephalohematoma (bleeding under the scalp but not under the skull), a broken clavicle, and birth defects that required multiple surgeries. The parties generally agree that parents timely and adequately addressed all of child's medical needs and were not responsible for those issues. However, the frequent medical appointments meant that child was routinely being examined.

On ten occasions in 2024, medical workers noted injuries to child. Some were reported by parents, some were discovered by medical workers, and in other cases it was unclear how the injuries had come to medical attention. Parents first reported marks to child's pediatrician in a mid-June appointment ("a couple of bruises"). Mother told the pediatrician that she (mother) bruises easily. Mother reported a bruise on child to the pediatrician on July 5 (upper left shoulder). On July 31, mother reported no new bruises, but the pediatrician located two cheek bruises and two thigh bruises. A healing clavicle injury was noted at this appointment; expert opinions varied as to whether it occurred at birth or after. Another mark was noted in an August appointment (mark on back). Parents surmised that the August mark was from a car seat buckle. Another mark was found on September 4 (on back along vertebrae). Parents surmised this mark may have come from a family member wearing a ring who handled child during a family event. A doctor discovered a new mark on September 7 (right ear). Parents claimed this mark came from child grabbing his own ears. Grandmother testified that child would tug hard on his ears. Parents reported more marks on September 13 (scratches on leg and lower abdomen). Parents noted that child had recently started attending childcare, but they were uncertain of the origins of the marks. Another mark (described as petechiae) was discovered on November 27 (left shoulder); parents attributed it to child's car seat.

Also on November 27, child sustained an injury to the upper frenulum in his mouth (which connects the lip to the gums). Father testified that child was injured while he went to use the restroom; when he returned, child was bleeding. Father surmised that child had been nervous at being

left alone and had self-inflicted the injury with his sharp fingernails. Parents took child to urgent care. No treatment or medication was needed. Dr. Leonhardt testified for ODHS and explained that such injuries are unusual and that it was improbable that an infant could do it to themselves. Up through the November 27 incidents, no person had been concerned enough to make a mandatory report. *See* ORS 419B.010 (requiring mandatory reporting of child abuse by public and private officials).

The instance that triggered a mandatory report and DHS involvement was when child was going in for surgery on December 10, 2024. Medical workers noted bruising on the child's legs, as well as a mark on child's right ear. Parents reported that they had noted the injuries for the first time at 4:30 that morning when they roused child to go in for surgery. Child's upper left leg had extensive pattern bruising; what caused the pattern was unclear, but experts testified it was not inconsistent with being grabbed by an adult hand. Child's right leg had fewer marks, and they were not patterned in the same way as on the left leg. An x-ray and CT scan that day showed no fractures, hemorrhages, or edema. Mother suggested that the leg bruising was received at daycare. A daycare worker testified that she had not seen the bruising on child when child was at daycare on December 9. The state Office of Training, Investigations, and Safety (OTIS) led an investigation of the daycare. An OTIS officer testified that they found no evidence to implicate anyone at the daycare. Child stopped attending that daycare after December 9.

DHS filed a petition for dependency jurisdiction on December 17, 2024, based on the history of unexplained injuries. A shelter care hearing was held the same day. The court ordered in-home placement, with either maternal or paternal grandmother to serve as a 24/7 safety service provider.

On January 28, 2025, maternal grandmother and mother reported a new mark. Mother and grandmother suggested the bruise could be from rolling onto a toy, as it coincided with child becoming newly mobile. The mark had been noticed in the morning, but mother did not report it

until after work, which led the trial court to order mother removed from the home.

While mother was out of the home, child showed further scratches and marks. ODHS thought the scratches had been caused by child's sharp fingernails, and the marks had been caused by child's bunched-up pajamas. ODHS was not alarmed by those marks, and we surmise that they were not part of the basis for jurisdiction.

The court held a dependency jurisdiction trial in April 2025 and rendered judgment the following month. ODHS alleged that jurisdiction existed under ORS 419B.100(1)(c) [1] and that particularly:

> "The child's condition or circumstances are such as to endanger the welfare of the child by reason of the following facts:
>
> "A.   While in the care and custody of the mother, the child suffered unexplained, non-accidental injuries that are at variance with the explanations given by the mother, placing the child at risk of harm.
>
> "B.   While in the care and custody of the father, the child suffered unexplained, non-accidental injuries that are at variance with the explanations given by the father, placing the child at risk of harm."

A caseworker testified that parents showed none of the traditional social risk factors for child abuse. They were not struggling to provide for the child, they had no criminal record, they had not shown anger or serious mental health issues, and they had no history with ODHS. ODHS had not witnessed any violence, no violence had been reported between parents, and child did not show a fear response to either parent.

Dr. Leonhardt testified for ODHS. Dr. Leonhardt was an on-staff child abuse doctor at the hospital where child had surgery on December 10. Initially, Dr. Leonhardt

---

[1] We note that ORS 419B.100(1)(e)(C) provides for jurisdiction where the child's parents "[s]ubjected the person to *** unexplained physical injury." But the jurisdictional petition only alleged jurisdiction under ORS 419.B100(1)(c). Thus, the parties argue over whether, under ORS 419B.100(1)(c), child's "condition or circumstances are such as to endanger the welfare of the person or of others."

concluded that the December 10 leg bruising was likely accidental but, after further investigation, concluded that the injury was the result of child abuse. Dr. Leonhardt acknowledged that child could have pulled at his own ear but maintained that child could not have self-inflicted the patterned leg bruise and that the ear mark was more than a child could have managed. Dr. Leonhardt concluded that the broken clavicle was inflicted post-birth based on how much it had healed. Dr. Leonhardt testified that he did not press on the bruises to see if they were blanchable or produced a pain response from child. He testified that child had received extensive testing for medical disorders that would cause easy bruising and that child lacked any such disorders. Dr. Leonhardt also testified that, absent such conditions, children do not bruise easily.

Dr. Adewusi, a CARES doctor who examined child, testified that she was "concerned for child physical abuse" and concluded that a previously reported mark was a bruise which would have resulted from blunt force trauma. At the time of her examination, child did not yet weigh enough for certain tests and, thus, his hematological workup was incomplete. Dr. Adewusi observed pictures of the December incident and concluded the marks were consistent with an adult grabbing child's leg.

Dr. Rothfeder testified for child. He concluded that the bruising was not the result of abuse and suggested that a dermatologist should be consulted. He opined that "the actual number of these occurrences much more suggested a contrary interpretation [to child abuse], particularly since all of the findings were superficial and asymptomatic." He suspected that there was a yet-unexplained genetic factor that was resulting in bruising. Dr. Rothfeder testified that the bruising was mild and did not result in pain upon palpation. He noted that severe bruising generally hurts upon palpation and results in discomfort by the child. Dr. Rothfeder disagreed with Dr. Leonhardt's conclusion that some people do not bruise easier than others.

Parents were called by both ODHS and themselves. Both denied hurting child or knowing how child had been hurt. Mother detailed how she had struggled to conceive

and suffered through four miscarriages and that child was wanted.

The trial court ruled that "some of the bruises are really concerning" and found jurisdiction.[2] It ruled that the clavicle fracture was not a basis for jurisdiction, implicitly finding that the injury had been inflicted during the difficult birth of child. It did not expressly rule on or discuss the frenulum tear, but it had expressed concern about that injury earlier in the trial. The trial court found that child had no known health issue that could cause easy bleeding or bruising and that it was unlikely that child had injured himself because, at the time of most injuries, he was a non-mobile infant. The court ordered wardship on May 28, 2025. The court terminated wardship on August 22, 2025.[3]

Again, mother, father, and child each assert the same assignment of error: that the trial court erred when it found dependency jurisdiction over child. While the appellants' particular arguments vary, each of them fundamentally argues that the facts the court found were insufficient to show a current threat of serious loss or injury to the child that is reasonably likely to be realized.

Pursuant to ORS 419B.100(1)(c), "the juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age" and "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others." Before a juvenile court can take jurisdiction under that statute, "'the state must prove, by a preponderance of the evidence, that a child's welfare is endangered because, under the totality of the circumstances, there is a current threat of serious loss or injury to the child that is reasonably likely to be realized.'" *Dept. of Human Services v. T. B.-L.*, 320 Or App 434, 440, 514 P3d 131 (2022) (quoting

---

[2] The trial court did not specify which bruises were the basis for jurisdiction. Father argues that the trial court thus must have relied on "some of the bruises," meaning between three and eight of the bruises—*i.e.*, more than a couple and less than all of them.

[3] Despite the end of wardship, the parties have not argued that the appeal is moot, and based on our review of the specific record in this case, we are satisfied that it is not. *See Johnson v. Premo*, 302 Or App 578, 581, 461 P3d 985, *rev den*, 366 Or 569 (2020) (recognizing that we have an "ongoing duty to evaluate the justiciability" of an appeal).

*Dept. of Human Services v. K. C. F.*, 282 Or App 12, 19, 383 P3d 931 (2016)).

We begin with arguments that mother and father make regarding the facts we must consider: first, regarding the frenulum tear, and second, the injuries more generally. The parties argue at length over the application of the standard of review to the frenulum tear. Parents and child argue that the frenulum tear was not discussed by the trial court and should not be automatically resolved against parents. ODHS argues that, as long as the trial court did not explicitly find in favor of mother and father (*i.e.*, by discounting the evidence, as the trial court did with the clavicle fracture) and there is any evidence to support that the frenulum tear was caused by parents, then we must conclude that the frenulum tear was caused by parents. But even ODHS expressed some discontent with this position when it was laid out in oral argument. The concurrence addresses that dispute in detail and ultimately concludes that, under our standard of review, properly applied, the frenulum tear was not attributable to parents. 350 Or App at 813-14 (Aoyagi, P. J., concurring). However, in this opinion, we assume, without deciding, that the juvenile court implicitly found that father—the only person who was near to child at the time—inflicted the injury and that it was not self-inflicted.

As to the non-frenulum injuries, parents argue that the record did not support a finding that they had caused those injuries. Parents point to child's status as an unusually medically fragile infant and argue that a ten-month old child, who had suffered from allergies, swallowing issues, malnutrition, and a cephalohematoma, and who had required multiple surgeries, might bruise more easily than a healthy child, even if the precise mechanism as to why remained a mystery. Further, parents argue that nobody testified that they saw parents inflict the injuries or ever be violent in any way.

While all that may be true, accepting all rational inferences in favor of the trial court's decision, a reasonable factfinder could have found that parents did cause the injuries. The testimony of ODHS's witnesses, Dr. Leonhardt chief among them, was that child had no discernable

condition that could cause spontaneous bruising, there was no other believable explanation for how child was injured, and that left parents as the only remaining source of the injuries. Of course, Dr. Rothfeder testified to the contrary, and a factfinder could come to a different conclusion given infant's medical history and the parent's social history. But this is not *de novo* review and so, to the extent that the juvenile court did, we must ultimately credit ODHS's witnesses. *N. P.*, 257 Or App at 639. Due to child's lack of mobility, and absent another explanation, a factfinder could conclude that parents were the only people with the opportunity to injure child or that parents had failed to supervise child so as to prevent others (including each other) from injuring child. That is not to say we must assume that those injuries were caused with the malicious intent to harm child, but the trial court could have concluded that they were caused by rough handling or carelessness on the part of parents. The remaining question is whether the severity, frequency, and timing of those injuries were legally sufficient to provide jurisdiction under the alleged basis.

The injuries prior to November 27 were all very minor. They were small bruises or light marks on the skin, none of which involved bleeding or broken skin, and none of which seemed to cause child pain or discomfort when examined. None of the doctors who contemporaneously observed the marks were concerned by those marks. Certainly, Dr. Leonhardt expressed that any mark on a nonmobile infant is cause for concern, but concern is not the standard for jurisdiction.

Having examined the testimony of the doctors and the available photos and medical records of the injuries, the most severe injuries were the November 27 frenulum tear and the December 10 leg bruises. The November 27 injury caused bleeding and clearly hurt child. The December 10 bruising did not break the skin but was still extensive— especially given that it was on both legs and covered much of child's upper left leg. While we do not aim to lessen or minimize that child was injured more than any child should be, this case stands out for the mildness of the injuries reported compared to what courts typically see. *E.g.*, *Dept. of Human*

*Services v. H. H.*, 266 Or App 196, 337 P3d 929 (2014), *rev den* 356 Or 837 (2015) (affirming jurisdiction where the child suffered from an "acute subdural hemorrhage, brain injuries, and retinal hemorrhages," and suffered severe developmental setbacks).

ODHS argues that any nonaccidental bruising in a nonmobile infant is a basis for jurisdiction and that we have routinely found bruising to be a basis for jurisdiction.

But the cases the parties point to each have other circumstances that also explain jurisdiction. *Dept. of Human Services v. D. L.*, 308 Or App 295, 297, 479 P3d 1092 (2020), *rev den* 367 Or 668 (2021) (affirming denial of order to terminate wardship where mother grabbed child and caused bruise, and mother had previously thrown a stool at child, causing black eye); *Dept. of Human Services v. C. A. M.*, 294 Or App 605, 616, 432 P3d 1175 (2018) (affirming jurisdiction over child whose twin had died under father's care, because mother knew or should have known that father had injured the child previously based on an eye bruise, and mother did not recognize that father could inflict harm); *Dept. of Human Services v. K. V.*, 276 Or App 782, 791, 369 P3d 1231, *rev den* 359 Or 667 (2016) (affirming jurisdiction where father had previously seen bruises on child, mother then caused extreme brain damage to child, and father had been convicted of abusing mother); *State ex rel. Juvenile Dept. of Douglas County v. Froats*, 117 Or App 467, 469, 844 P2d 917 (1992) (affirming judgment of jurisdiction where two year old found with seven to 10 dime-sized bruises on her abdomen at once, had bruising on other parts of body, and had serious injury to liver). In each of those cases, the bruising was accompanied by other serious circumstances or injury.

Here, there were few other circumstances that increased the severity of the incidents. Child suffered no broken bones (as the trial court ascribed the clavicle fracture to birth), no bleeding or broken skin in the bruising incidents, and no other serious medical complications. The frenulum tear, which we are assuming is attributable to parents, is a more severe accompanying circumstance, although the resultant bleeding was minor and did not require treatment, and it was not inflicted at the same time as the leg

bruises. But the ultimate question for us on review is: based on the severity of the prior injuries and the timing of those injuries, was there a *current* risk of serious injury or loss?

Under the standard of review, we must assume that some of the incidents involved situations where parents injured or failed to protect child (each incident often containing multiple injuries) in the first six or so months of the child's life. The most severe injuries were the November 27 frenulum tear and the December 10 bruising. But in the next five months of child's life leading up to the jurisdictional trial, there was only one incident in which a parent injured or failed to protect child. The January injury (a small, curved bruise, which parents alleged was the result of child rolling onto a toy)—and the only injury after December 10—was a very minor one. Given that the earlier injuries were themselves mostly minor or very minor, parents had been cooperative with ODHS and the safety service providers, and no new injuries occurred after January, and given the limited evidence of any other parental misbehavior or neglect, we cannot say that the facts as found were sufficient to show a current threat of serious harm to child at the time of the jurisdictional trial. *Dept. of Human Services v. M. Q.,* 253 Or App 776, 785, 292 P3d 616 (2012) ("it is not sufficient for the state to prove that the child's welfare was endangered sometime in the past"); *Dept. of Human Services v. J. L. D.*, 339 Or App 259, 567 P3d 485 (2025) (reversing assertion of jurisdiction where the child had previously tested positive for drugs, but ameliorative steps had been taken and the issue was not reasonably likely to recur).

Reversed.

**AOYAGI, P. J.,** concurring.

I agree in full with the majority opinion. I write separately to address the appellate standard of review, which is the subject of some disagreement in this case, specifically as it relates to the frenulum tear. The juvenile court did not mention the frenulum tear in asserting dependency jurisdiction. ODHS takes the position that we must assume an implied finding that parents caused it; parents and child disagree. The majority assumes arguendo that the juvenile

court implicitly found that parents caused it. 350 Or App at 810. I agree with that approach, given the limited briefing on the standard of review and given that it does not affect the disposition.

The issue of implied findings is a particularly important one, however, not only for juvenile dependency appeals, but for a wide variety of appeals to which the same standard of review applies. That standard of review has developed over such a long time and in such a manner that I suspect parties may find it confusing at times and unclear how to apply. I therefore take this opportunity to examine the standard of review in some depth, including explaining how it came to be the standard of review in dependency appeals, discussing its application, and emphasizing the important limitation that we and the Supreme Court have recognized on the assumption of implied findings by the trial court. I will also explain why, given that important limitation, if we did need to reach the issue, I would not assume an implied finding that parents caused the frenulum tear.

## BEGINNING WITH BALL

In 1968, the Oregon Supreme Court decided Ball v. Gladden, 250 Or 485, 443 P2d 621 (1968), a post-conviction case that has had an enduring impact on appellate standards of review well beyond post-conviction. The petitioner in *Ball* was convicted of murder and sought post-conviction relief, asserting that his "federal constitutional right of due process was violated because his admission was coerced." *Id.* at 486. The post-conviction court denied relief. *Id.* On appeal, the Oregon Supreme Court affirmed, but it first took the opportunity to clarify the standard of review. The court acknowledged some prior inconsistency and expressly adopted the same standard used by federal courts to review voluntariness rulings under the federal constitution:

> "It has been called to the court's attention in this case and another presently pending before it, that the scope of review by this court of questions concerning voluntariness of admissions and confessions has not always been consistent. As a result, it would appear appropriate to discuss in some detail what we consider our proper scope of review of

questions concerning the voluntariness of admissions and confessions.

> "What actually transpired is a question of fact for the trial court or jury.[1] If the evidence sustains such historical factual findings they will not be disturbed by this court. If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion, *e.g.*, voluntariness or lack thereof, made by the trial court or jury. Whether these historical facts as found are sufficient to sustain a finding of voluntariness which meets state and federal constitutional concepts of due process is another question, and one which falls within our proper scope of appellate review. * * * In other words, we are not bound by a trial judge or jury's finding of voluntariness if we believe the historical facts upon which such finding is based are insufficient to meet constitutional standards of due process. This is pursuant to our duty to interpret constitutional standards and require conformance thereto."

*Id.* at 487-88 (footnote omitted).

On its face, *Ball* dictates the standard of review for a very specific type of ruling—that a criminal defendant's confession was voluntary and thus need not be suppressed—and, initially, that is how it was applied. *E.g.*, *State v. Atkins*, 251 Or 485, 496-97, 446 P2d 660 (1968); *Miotke v. Gladden*, 250 Or 466, 443 P2d 617 (1968). The *Ball* standard soon spread to other areas of the law, however, often with little explanation.

In criminal law, the *Ball* standard has become the standard of review for suppression rulings generally. *State v. Hansen*, 295 Or 78, 82 n 2, 664 P2d 1095 (1983); *e.g.*, *State v. Jackson*, 172 Or App 414, 421 n 8, 19 P3d 925 (2001) (suppression of evidence obtained after an invalid waiver of the constitutional right to counsel); *State v. Fisher*, 5 Or App 483, 486, 484 P2d 864 (1971) (suppression of evidence obtained in an unconstitutional search). It also is used to review other pretrial rulings that require factfinding. *E.g.*, *State v.*

---

[1] Historically, if the state wanted to introduce the defendant's confession into evidence at trial, it had to prove voluntariness twice—first to the trial court, and then to the jury. *State v. Brewton*, 238 Or 590, 603, 395 P2d 874 (1964).

*Carlson*, 311 Or 201, 214, 808 P2d 1002 (1991) (evidentiary rulings under OEC 104(1)); *State v. King*, 84 Or App 165, 174-75, 733 P2d 472, *rev den*, 303 Or 455 (1987) (competency to stand trial). And it is now the standard of review for all rulings granting or denying post-conviction relief. *Montez v. Czerniak*, 355 Or 1, 8, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014); *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002). That list is illustrative, not exhaustive.

The *Ball* standard also has made its way into civil litigation. In the four decades following *Ball*'s issuance, we intermittently cited it as authority for deferring to a trial court's factual findings on a given issue. *E.g.*, *Emmert v. No Problem Harry, Inc.*, 222 Or App 151, 159, 192 P3d 844 (2008) (counterclaims for conversion and intentional interference with economic relations tried to the court); *Knox v. GenX Clothing, Inc.*, 215 Or App 317, 319, 168 P3d 1251 (2007) (denial of motion to set aside a default judgment); *City of Pendleton v. One 1998 Dodge Stratus*, 180 Or App 72, 74 nn 3 & 4, 42 P3d 339 (2002) (civil forfeiture order regarding a vehicle); *Gold v. Casserly Landscape, Inc.*, 121 Or App 62, 65 n 3, 853 P2d 1341 (1993) (insurance coverage in a garnishment proceeding); *Ierulli v. Lutz Development Co.*, 73 Or App 311, 316, 698 P2d 504, *rev den*, 299 Or 443 (1985) (breach of contract claim tried to the court). However, as explained in the next section, it was the 2009 changes to *de novo* review in equitable proceedings that triggered the biggest expansion of the use of the *Ball* standard in noncriminal cases.

EXPANSION OF THE *BALL* STANDARD AFTER 2009

Prior to 2009, this court conducted mandatory *de novo* review on appeal in all equitable proceedings, meaning that we tried the cause anew upon the existing record. ORS 19.415(3) (2007), *amended by* Or Laws 2009, ch 231, § 2 ("Upon an appeal from a judgment in an equitable proceeding, the Court of Appeals shall try the cause anew upon the record."). That included juvenile dependency cases. *See State v. S. T. S.*, 236 Or App 646, 654, 238 P3d 53 (2010) (recognizing that we were "required to review the evidence in a juvenile dependency case *de novo*" before 2009).

In 2009, the law changed, making *de novo* review discretionary in most equitable cases. *Hammond v. Hammond*, 246 Or App 775, 777, 268 P3d 691 (2011). Mandatory *de novo* review stills applies to the termination of parental rights. ORS 19.415(3)(a). That is, when a juvenile court terminates a person's parental rights, this court continues to try the cause anew upon the existing record, making our own factual findings and our own decision on termination. *Id.* In all other equitable proceedings, including dependency proceedings, it is now discretionary whether to conduct *de novo* review on appeal. ORS 19.415(3)(b). We also now have the option of full or partial *de novo* review. We may "try the cause anew upon the record," which is traditional full *de novo* review, or we may "make one or more factual findings anew upon the record," a more limited form of *de novo* review created in 2009. *Id.* In practice, since the change in the law, it is extremely rare for us to conduct discretionary *de novo* review. Requests for it are officially "disfavored," ORAP 5.40(8)(c), and our policy is only to provide it in what we deem to be "exceptional cases," ORAP 5.40(8)(b).

The changes to *de novo* review applied to cases appealed after June 4, 2009. *Hammond*, 246 Or App at 777. Consequently, beginning around 2010, we began needing to articulate standards of review in many different types of cases that had previously been tried anew on appeal. And lawyers who could previously just challenge the outcome of an equitable proceeding and let us reach our own decision on the existing record suddenly needed to identify specific rulings to challenge on appeal and the applicable standard of review for such rulings. *See* ORAP 5.45(3) ("Each assignment of error must identify precisely the legal, procedural, factual, or other ruling that is being challenged."); ORAP 5.45(5) (requiring each assignment of error to "identify the applicable standard or standards of review" and authority therefor).

In the controlled chaos that followed, it was easy to look to the already familiar *Ball* standard to provide a standard of review for rulings that had never before needed one. Any tether between *Ball* and federal constitutional law had already been loosened to the point of irrelevancy. Again and again, we looked to the *Ball* standard to fill the

standard-of-review gap for equitable proceedings, which, by definition, are always tried to the court and thus necessarily entail trial court factfinding.

To give just a few examples, as of this writing, the *Ball* standard has been adopted as the standard of review for most or all types of restraining orders. *E.g.*, *R. M. v. McNeer*, 341 Or App 425, 432-33, 575 P3d 137, *rev den*, 374 Or 421 (2025) (FAPA restraining order); *E. H. v. Byrne*, 311 Or App 415, 416, 487 P3d 869 (2021) (sexual abuse protective order); *A. K. F. v. Burdette*, 310 Or App 49, 51, 484 P3d 362 (2021) (EPPDAPA restraining order); *Travis v. Strubel*, 238 Or App 254, 256, 257, 242 P3d 690 (2010) (stalking protective order). It has been used in civil commitment appeals. *E.g.*, *State v. A. D. S.*, 258 Or App 44, 45, 308 P3d 365 (2013). It is used in juvenile delinquency appeals. *E.g.*, *State v. J. L. C.*, 249 Or App 559, 561, 277 P3d 625 (2012). Most pertinently for present purposes, it is used in juvenile dependency appeals, including to review the assertion of dependency jurisdiction or a change to a child's permanency plan. *Dept. of Human Services v. C. H.*, 373 Or 26, 47, 559 P3d 395 (2024); *Dept. of Human Services v. Y. B.*, 372 Or 133, 149-51, 546 P3d 255 (2024).

Juvenile dependency was, in fact, one of the first types of equitable proceedings in which we adopted the *Ball* standard as the standard for non-*de novo* review. We did so in *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010), articulating the standard of review as follows:

> "[W]e review the juvenile court's legal conclusions for errors of law, but are bound by its findings of historical fact unless there is no evidence to support those findings. Where findings on disputed issues of fact are not made but there is evidence supporting more than one possible factual conclusion, we presume that the juvenile court decided the facts consistently with its ultimate legal conclusion. Therefore, our task is to review the facts found by the juvenile court to determine whether they are supported by any evidence, and then to determine whether, as a matter of law, those facts together with facts impliedly found by the juvenile court, provide a basis for juvenile court jurisdiction under ORS 419B.100(1)(c)."

(Citations omitted.)

We reaffirmed that standard of review in *Dept. of Human Services v. N. P.*, 257 Or App 633, 636, 307 P3d 444 (2013), an en banc opinion on reconsideration in which we acknowledged inconsistency in the post-2009 case law and directly addressed the standard of review. The father in *N. P.* challenged dependency jurisdiction, and, initially, we had taken the view that "whether a parent's condition creates a current threat of serious loss or injury is a question of fact and, therefore, subjected to a deferential 'any evidence' standard of review." *Id.* at 638. On reconsideration, we decided that the *Ball* standard applied (albeit without calling it that) and described that standard as follows:

> "We begin with a fundamental functional premise. Our inquiry and corollary review function is this: On the record before it, did the juvenile court err in making the statutorily prescribed determination? Or, stated more positively and precisely, did the record permit the juvenile court to determine that the child's condition or circumstances gave rise to a current threat of serious loss or injury to the child and that there is a reasonable likelihood that the threat will be realized?

> "Our non-*de novo* review of such a determination is analogous to the deferential review of other factually predicated determinations that are, ultimately, circumscribed by limits of 'matter of law' sufficiency, for example, denials of motions for directed verdict or motions for judgment of acquittal. That is, we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome. Specifically, with respect to a juvenile court's determination under ORS 419B.100(1)(c), we: (1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally

sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied.

"We emphasize that our non-*de novo* appellate review function does not allow us to substitute our assessment of the persuasiveness of the evidence for the juvenile court's, nor does it allow us to revisit the juvenile court's resolution of factual disputes or its choice among reasonable inferences. Rather, as (again) with our review of rulings on motions for directed verdicts or motions for judgment of acquittal, our function is limited to determining whether the evidence was sufficient to permit the challenged determination."

*Id.* at 639-40 (internal quotation marks and citation omitted); *see also Y. B.*, 372 Or at 149-51 (endorsing the standard of review from *N. P.* and adopting it for use in reviewing juvenile court decisions to maintain or change a child's permanency plan).

Despite good intentions to clarify the law, the foregoing passage from *N. P.* likely caused more confusion than it cleared up. Conceptually, under the *Ball* standard, what the appellate court is doing is applying the law *to the facts found by the trial court. See Ball*, 250 Or at 487 (framing the question as "[w]hether the[] historical facts as found are sufficient to sustain" the trial court's disposition); *C. Z.*, 236 Or App at 442 (describing "our task" as determining whether "the facts found by the juvenile court," both expressly and impliedly, are sufficient "as a matter of law" to "provide a basis for juvenile court jurisdiction"). The middle paragraph of the above-quoted passage from *N. P.* clearly adopts that standard of review for dependency jurisdiction decisions. *See N. P.*, 257 Or App at 639-40 (describing the standard of review as requiring us to "assess whether the combination of [the juvenile court's express factual findings supported by evidence] and [the juvenile court's implicit factual findings], along with nonspeculative inferences, was legally sufficient" to establish dependency jurisdiction).

What is confusing about *N. P.* is that that clear statement of the standard of review is sandwiched between statements suggesting a significantly different standard of review—that which applies to review of a directed verdict ruling in a civil case or the denial of a motion for judgment

of acquittal (MJOA) in a criminal case. In reviewing those types of rulings, we view *all the evidence* in the light most favorable to the nonmoving party and decide whether *the evidence* was legally sufficient to prove the claim or charge.[2] *N. P.* inexplicably points to the directed verdict/MJOA standard of review on either side of describing the *Ball* standard of review and seems to conflate them. *See id.* at 639 (referring to "the record" before the juvenile court and what "the record" permitted, expressly analogizing to the standard of review for directed verdicts and MJOAs, and stating that "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome"); *id.* at 640 (again referring to the standard of review for directed verdicts and MJOAs, and stating that "our function is limited to determining whether the evidence was sufficient to permit the challenged determination").

---

[2] An MJOA in a criminal case may be made at the close of the state's case or at the close of all evidence and is to be granted "if the evidence introduced theretofore is such as would not support a verdict against the defendant." ORS 136.445. In reviewing the denial of an MJOA, we view all the evidence "in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential element of the crime beyond a reasonable doubt." *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). The standard of review is the same for a ruling on a motion for directed verdict in a civil jury trial, which may be made at the close of the plaintiff's evidence or the close of all evidence under ORCP 60—that is, the motion should be granted if "there is no evidence from which the jury could have found the facts necessary to support plaintiff's claim." *Miller v. Agripac, Inc.*, 322 Or App 202, 222, 518 P3d 957 (2022), *rev den*, 370 Or 827 (2023) (internal quotation marks omitted). The standard of review is also the same for a ruling on a motion for involuntary dismissal based on insufficient evidence in a civil bench trial, which may be made after completion of the presentation of the plaintiff's evidence. ORCP 54 B(2); *Venture Properties, Inc. v. Parker*, 223 Or App 321, 332, 336, 341 n 13, 195 P3d 470 (2008) (one way to obtain involuntary dismissal under ORCP 54 B(2) is to show that "[t]he plaintiff has failed to present a *prima facie* case," which is "the 'directed verdict' standard," to which the same standard applies as for a directed verdict under ORCP 60).

Factual findings made by the trial court or the jury at verdict are irrelevant to our review of a ruling on an MJOA, directed verdict motion, or ORCP 54 B(2) motion based on legal insufficiency. *See State v. Lupoli*, 348 Or 346, 366, 234 P3d 117 (2010) (the MJOA standard requires the court to view all the evidence in the state's favor and decide whether "any rational trier of fact" could find the defendant guilty); *City of Medford v. Herbison*, 57 Or App 496, 500, 645 P2d 563, *rev den*, 293 Or 394 (1982) ("A directed verdict is proper only if an allegation is not supported by any substantial evidence; the court is not to weigh conflicting evidence or evaluate credibility.").

As discussed more in the next section, it is inapt to describe the *Ball* standard as testing the legal sufficiency of the "evidence" or "record," yet that language has frequently been repeated in our case law since *N. P.*, which I perceive to have caused significant confusion regarding the applicable standard of review.

### EVOLUTION OF THE *BALL* STANDARD AND RECOGNITION OF LIMITS ON IMPLIED FACTUAL FINDINGS

I doubt that the Oregon Supreme Court would have foreseen in 1968, when it decided *Ball*, that the standard it adopted for use in reviewing the voluntariness of a criminal defendant's confession would spread to so many other areas of the law over time. It has done so, however, and it is clearly the standard that applies in dependency appeals, including those challenging the assertion of dependency jurisdiction. Because it is so widespread, I will continue to refer to it as the *Ball* standard, rather than the *N. P.* standard or the like, which would suggest something specific to juvenile dependency.

The most notable thing about the *Ball* standard is how it differs from other standards of review in terms of what it tests and how. As already discussed, the *Ball* standard does not actually test the legal sufficiency of *the evidence*, even though it is often described that way. An MJOA, motion for directed verdict, or motion for involuntary dismissal based on insufficient evidence all test the legal sufficiency of *the evidence*, in that they require the trial or appellate court to determine whether the evidence was legally sufficient to allow a rational factfinder to make the findings necessary to reach a particular verdict. It does not matter what findings one particular factfinder made. *See* 350 Or App at 821 (Aoyagi, P. J., concurring). The whole idea of such motions is that the matter should not have gone to the factfinder at all due to the lack of legally sufficient evidence to prove the charge or claim.

What the *Ball* standard really tests is whether the factfinder *correctly applied the law*, albeit in a different way from other familiar standards of review used in cases that

have gone to trial. There are mechanisms in criminal and civil litigation to ensure that the correct law is applied at trial. The mechanism in a jury trial is jury instructions. If a trial court misinstructs the jury on the law, then the losing party will normally be entitled to a new trial, unless the instructional error was harmless. *Martineau v. McKenzie-Willamette Medical Center*, 371 Or 247, 252-53, 533 P3d 1, *adh'd to as modified on recons*, 371 Or 408, 537 P3d 542 (2023). It does not matter that the evidence was legally sufficient to allow the verdict—the verdict is still infirm if, due to a misinstruction on the law, the jury might have reached that verdict without making the factual findings necessary to support it. *Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106-07, 957 P2d 147 (1998) (instructional error requires reversal if it "probably created an erroneous impression of the law in the minds of the members of the jury, and if that erroneous impression may have affected the outcome of the case").

Testing the correctness of the law applied in a criminal or civil bench trial is more complicated, due to the lack of a formal mechanism comparable to jury instructions, but the same principle applies. *State v. Butterfield*, 332 Or App 526, 534, 540-42, 549 P3d 545 (2024) (explaining that, "as we would for a challenge to jury instructions, we review for legal error" whether the trial court misinstructed itself on the law in a bench trial; holding that the court misinstructed itself on the elements of third-degree robbery; and remanding for a new trial on the affected count). Ultimately, regardless of how a record is made, the trial court "cannot refuse to disclose" the law that it applied, because parties have a right to meaningful appellate review, as well as an obligation to preserve their claims of error, and one must know what law was applied to challenge its correctness. *State v. Colby*, 295 Or App 246, 250-53, 433 P3d 447 (2018).

Review for instructional error, including self-instructional error, is a direct means of ensuring that the factfinder applied the correct law. The standard of review is designed to overcorrect too, in that it requires reversal whenever a misinstruction on the law may have affected the outcome of the trial, which will necessarily capture some cases in which the instructional error did not actually affect

the outcome. We accept that result because, absent knowing all of the factfinder's findings—which one rarely does—there is no way to know for sure whether the found facts would result in the same verdict under a correct application of the law.

To my knowledge, we have never explained why we adopted the *Ball* standard of review for use in equitable proceedings that effectively go to "trial," such as juvenile dependency, juvenile delinquency, and civil commitment, rather than treating those types of proceedings similarly to civil trials with respect to preservation of error, standards of review, and the like. I will not speculate on that point. The *Ball* standard is what has been adopted, and, as I understand it, what the *Ball* standard is meant to test is whether the trial court *correctly applied the law to the facts that it actually found*. It differs from the standards of review used to test whether the correct law was applied at trial in that, rather than looking directly at the law applied, it requires us to apply the law ourselves to the set of facts found by the trial court. In that regard, it mimics the process of *de novo* review, except that we have swapped out who supplies the facts—it is now the trial court, rather than us. *See, e.g.*, *State v. R. H.*, 237 Or App 245, 252, 239 P3d 505, *rev den*, 349 Or 480 (2010) ("Because, as noted above, we have not chosen to exercise *de novo* review, our task is to determine whether the historical facts that the court found are supported by any evidence, and then to determine whether, as a matter of law, those facts provide a basis for juvenile court jurisdiction.")

What complicates things is that, even in equitable proceedings, trial courts rarely make express findings on every factual issue for which there is evidence, necessitating a rule on when findings will be *implied* for purposes of appellate review under the *Ball* standard.

Regarding implied findings, *Ball* states that if the trial court did not make findings on all historical facts relevant to the voluntariness of a confession, "we will presume that the facts were decided in a manner consistent with the ultimate conclusion" on voluntariness. 250 Or at 487. That could be read to mean that, if the only way that the

trial court could have reached a legally correct conclusion is if it made a particular finding, and it did not expressly make that finding, then we will assume an implied finding, regardless of the court's stated reasoning or its other findings. However, such a broad reading of *Ball* has been decisively rejected.

In *State v. Jackson*, 296 Or 430, 432, 677 P2d 21 (1984), the trial court ordered suppression of evidence obtained after an officer used a flashlight to look inside a vehicle stopped for a traffic infraction. The trial court made fairly detailed findings regarding the stop, including that the officer saw two open beer cans through the window with his flashlight, which motivated him to search the vehicle. *Id*. The trial court suppressed the evidence found in the search, based on the flashlight use being unlawful. *Id*. at 434. The Supreme Court disagreed and held that the flashlight use was lawful. *Id*. at 438-39. That made it necessary to consider whether the officer seeing the beer cans justified the search, which depended on whether it was "immediately apparent" that a law had been violated. *Id*. at 439. That in turn depended on "whether the beer cans were open and upright as contended by the state or empty and not sitting up as contended by the defendant." *Id*. at 440.

The trial court did not make an express finding on that issue, and the Supreme Court declined to assume an implied finding because, as it "interpret[ed] the record," the trial court's reason for granting suppression made it unnecessary for the trial court to make a finding on that issue. *Id*. The rule from *Ball* "that when the trial court does not make express findings the Court of Appeals and [Supreme Court] must presume that conflicts in the evidence were resolved by findings of fact that are consistent with the ultimate conclusion of the trial court" was therefore "inapplicable." *Id*. The court would not assume an implied finding regarding the beer cans when the trial court "never made *any* conclusions about the 'immediately apparent' violation issue." *Id*. (emphasis in original). Instead, it remanded for further factfinding by the trial court. *Id*. at 441.

It was 16 years before *Jackson* was cited in an appellate decision for its holding on implied findings. In *State*

*v. McNeil*, 170 Or App 407, 409-10, 12 P3d 992 (2000), the issue was whether the sentencing court in a criminal case erred in failing to use the "shift-to-I" rule for consecutive sentences. The state had made two arguments to the trial court against application of that rule, one of which it abandoned on appeal and the other of which was that there were multiple victims. *Id.* at 410. The sentencing court had not explained its rationale for not applying the shift-to-I rule. *Id.* at 412. Citing *Jackson*, we declined to assume an implied finding of multiple victims. There was conflicting evidence on that issue, the sentencing court's apparent rationale for imposing consecutive sentences did not require it to find multiple victims, and the court was silent as to its rationale for not applying the shift-to-I rule. In those circumstances, we deemed it inappropriate to assume an implied finding on multiple victims. *Id.* at 412-13. We instead remanded for further factfinding. *Id.* at 413.

We addressed the limitations on implied findings again a decade later in *State v. Lunacolorado*, 238 Or App 691, 243 P3d 125 (2010), *rev den*, 350 Or 530 (2011). The issue in that case was the voluntariness of the Spanish-speaking defendant's statements to police after receiving *Miranda* warnings in English. *Id.* at 693. The trial court ruled that the statements were voluntary, without expressly finding that the defendant understood the *Miranda* warnings. *Id.* at 694. On appeal, the state argued that, under *Ball*, we had to assume that the trial court implicitly found that the defendant understood the warnings, by mere virtue of the fact that there was conflicting evidence on that issue and no express finding. *Id.* at 695-96. We rejected that argument, describing it as "load[ing] *Ball* with more freight than it can carry." *Id.* at 696. We explained that *Ball* "allows us to infer a finding of fact that the trial court d[id] not expressly make" only if that finding "is a necessary predicate to the court's conclusion." *Id.* If the trial court had misunderstood the law to require only that *the officer* believed the defendant understood the warnings (as the defendant contended), then we would not assume an implied finding on what the defendant understood as it was not necessary to the court's conclusion. *Id.* We stated that, under *Ball*, we will "infer a finding of fact *** only where we can deduce that the trial

court's chain of reasoning must necessarily have included that fact as one of its links."[3] *Id.* at 696.

The Oregon Supreme Court endorsed *Lunacolorado*'s approach to implied findings in *Pereida-Alba v. Coursey*, 356 Or 654, 671, 342 P3d 70 (2015). The petitioner in that case was convicted of first-degree robbery and sought post-conviction relief, claiming that his trial counsel provided constitutionally inadequate assistance by failing to request a jury instruction on the lesser-included offense of third-degree robbery. *Id.* at 656. The post-conviction court granted relief, the superintendent appealed, and a key issue on appeal was whether the post-conviction court implicitly found that trial counsel "failed to consider" requesting an instruction on the lesser-included offense. *Id.* at 656, 670. In that context, the Supreme Court, citing *Jackson* and *Lunacolorado*, described when an implied finding is to be assumed under the *Ball* standard:

> "[W]e presume that a trial court implicitly resolves factual disputes consistently with its ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). That presumption has its limits, however. If an implicit factual finding is not necessary to a trial court's ultimate conclusion or is not supported by the record, then the presumption does not apply. *See State v. Jackson*, 296 Or 430, 440, 677 P2d 21 (1984) (declining to attribute an implicit factual finding to a trial court when that court 'never made *any* conclusions' regarding that factual issue) (emphasis in original); *State v. Lunacolorado*, 238 Or App 691, 243 P3d 125 (2010) (explaining that appellate courts may presume that a trial court made implicit factual findings when 'there is conflicting evidence about a fact that is a necessary predicate to the court's conclusion')."

*Pereida-Alba*, 356 Or at 670-71.

With that understanding, the Supreme Court declined to assume that the post-conviction court implicitly found that trial counsel failed to consider requesting the instruction, because such a finding was not necessary to the

___

[3] In *Lunacolorado*, we ultimately concluded based on the record that the trial court had understood the law correctly and therefore necessarily did find that the defendant understood the warnings given in English, such that it was appropriate to assume an implied finding on that issue. 238 Or App at 698.

court's expressed reasoning. *Id*. at 671. The post-conviction court's reasoning in granting relief was that any lawyer providing constitutionally adequate assistance would have requested an instruction on the lesser-included offense. *Id*. Under that reasoning, it did not matter whether trial counsel considered requesting the instruction or not, as his assistance would be inadequate either way; therefore, it could not be assumed that the post-conviction court made an implied finding on that issue. *Id*. The Supreme Court disagreed, however, that all trial counsel providing adequate assistance would have requested the instruction. *Id*. at 668-70. It therefore did matter why trial counsel did not request the instruction, and factfinding was needed on that issue. *Id*. at 671-74. The case was remanded to the post-conviction court for further factfinding. *Id*. at 673-74.

The limitation on implied findings recognized in the foregoing line of cases is an important one. It is a limitation on which we have repeatedly relied. *See, e.g.*, *State v. Dunham*, 336 Or App 30, 43-44, 560 P3d 736 (2024) (because it was unclear which of three paths the trial court "had in mind," it "would be improper for us to simply presume the necessary factual findings and go directly to the last step of the analysis"); *State v. Simmons*, 314 Or App 507, 515, 499 P3d 127 (2021) (where the trial court's reasoning suggested that its finding of contempt was not "predicated on whether defendant had a good faith belief or not," we would "not presume, as the state asserts that we should, that the trial court implicitly found that defendant did not have a subjective belief that the no-contact provision had been lifted"); *State v. Gatto*, 304 Or App 210, 218, 466 P3d 981 (2020) (declining to "presume an implicit finding, because it was not necessary to the trial court's ruling"); *Dept. of Human Services v. T. L. H. S.*, 292 Or App 708, 720 n 5, 425 P3d 775 (2018) (explaining that the juvenile court did not "expressly or implicitly" resolve certain factual issues, "because it viewed them as irrelevant to jurisdiction," so we would not assume implied findings on those issues); *State v. Parnell*, 278 Or App 260, 270, 373 P3d 1252 (2016) ("[B]ecause the trial court did not separately consider or rule on the validity of the subsequent consent to search the home, we cannot presume that the trial court made implicit findings consistent with

its ruling." (Internal quotation marks and brackets omitted.)); *State v. Olinger*, 240 Or App 215, 224 n 7, 246 P3d 20 (2010), *rev den*, 350 Or 423 (2011) (citing *Ball* for the proposition that, where the trial court "did not rule on [an] issue, we cannot presume that it made implicit findings").

Despite its importance and longstanding existence, it is easy to forget about the limitation on implied findings under the *Ball* standard of review, particularly when so many cases inaptly describe the *Ball* standard in terms of legal sufficiency of the evidence, rather than legal sufficiency of the factual findings. Here, for example, the parties have not seriously engaged with the standard-of-review case law as relevant to the frenulum tear, even though this is a close case in which the frenulum tear could have been dispositive. That is why I have taken this opportunity to discuss at some length the standard of review, its origins, and the case law interpreting it.

## APPLICATION OF THE *BALL* STANDARD

To summarize the current state of the law, in cases in which the *Ball* standard of review applies, including juvenile dependency cases, we are to apply the standard of review as follows:

- As to any issues of historical fact on which the trial court made express findings, we accept those findings, so long as they are supported by evidence in the record. *Ball*, 250 Or at 487.

- As to any issue of historical fact on which the trial court did not make an express finding, we will assume an implied finding in the prevailing party's favor *if* such finding was "necessary" to the trial court's ultimate conclusion and is supported by the record. *Pereida-Alba*, 356 Or at 670-71. A finding is "necessary" only if "we can deduce [from the record] that the trial court's chain of reasoning must necessarily have included that fact as one of its links." *Lunacolorado*, 238 Or App at 696.

- We then apply the law to that set of facts. That is, we determine whether the trial court's express and implied findings support the disposition. *Ball*, 250 Or at 487; *N. P.*, 257 Or App at 639-40.

In this case, applying that standard, if we had to reach the issue, I would not assume an implied finding on the frenulum tear. The cause of the frenulum tear was disputed at the jurisdictional trial, with ODHS putting on evidence that parents caused it and parents putting on evidence that child caused it himself. The juvenile court made no mention of the frenulum tear in asserting dependency jurisdiction. Logically, on this record, if the court had found that parents caused the frenulum tear, it would have said so. It bears noting that ODHS bore the burden of proof. *Dept. of Human Services v. D. L.*, 308 Or App 295, 302, 479 P3d 1092 (2020), *rev den*, 367 Or 668 (2021). If the court was unpersuaded by ODHS's evidence that parents caused the frenulum tear, but not necessarily prepared to find that child caused it himself, it would be natural to have simply not mentioned the frenulum tear. Conversely, if the court made a decision on the cause of the frenulum tear, it almost certainly would have said so, given how the case was litigated. Under the circumstances, I would not assume an implied finding that parents caused the frenulum tear.

Notably, if the juvenile court had expressly said that it was unpersuaded by ODHS's evidence regarding the cause of the frenulum tear, we would treat that the same as a "finding" on that issue. *State v. Johnson*, 335 Or 511, 523, 73 P3d 282 (2003) (explaining that, in addition to being bound by affirmative findings, appellate courts also "are bound by a trial court's 'finding' that a party's evidence is not sufficiently persuasive"). "[C]onsider[ing] ourselves equally bound by a trial court's acceptance or rejection of evidence" affords "judicial respect for the trial court's weighing of the evidence." *Id*. Here, if we were going to assume any implied finding regarding the cause of the frenulum tear, I would assume an implied "finding" that the juvenile court was unpersuaded by ODHS's evidence on that issue.

I respectfully concur.